Randy BLACKWELDER, Alice Black-
welder, Carmon Blackwelder, Kath-
erine Blackwelder, Stephen Standish,
Debora Standish, Aaron Standish,
George Lonneville, Hilda Lonneville,
Amy Lonneville, and Jacqueline Lonne-
ville, Plaintiffs,

v.

Henry SAFNAUER, in his official capaci-
ty as the Superintendent of the Cato–
Meridian Central School District; Ed-
ward Garno, in his official capacity as
Superintendent of the City School Dis-
trict of Oswego; and Michael Hunsing-
er, in his official capacity as Superin-
tendent of the Waterloo Central School
District, Defendants,

and

The State of New York,
Intervenor–Defendant.

No. 86–CV–1208.

United States District Court,
N.D. New York.

June 17, 1988.

Michael P. Farris, Washington, D.C., David Rollinson, Syracuse, N.Y., for plaintiffs.

Bond, Schoeneck & King, Syracuse, N.Y., for defendants Safnauer, Hunsinger & Garno; Deborah H. Karalunas, Jonathan B. Fellows, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for intervenor defendant State of N.Y.; Alfred J. Sciarrino, Asst. Atty. Gen., of counsel.

Norman H. Gross, Albany, N.Y., for Proposed amicus curiae New York State United Teachers, AFL–CIO, and New York School Boards Ass'n, Inc.; Jay Worona, Associate Counsel, of counsel.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

This is an action commenced under 42 U.S.C. § 1983 that presents a variety of constitutional challenges to a New York statute governing the minimum standard of instruction that must be provided to minors between the ages of six and sixteen who are taught outside of the public schools of the cities and districts of the state. This case involves the practice of "homeschooling," or the instruction of children at home by their parents or other private instructors. Plaintiffs are homeschooling parents and children who for religious reasons have chosen this alternative form of education in lieu of public education. Defendants are the State of New York and the three superintendents of schools for the districts in which the various plaintiffs reside. The challenged statute, § 3204 of New York's Education Law, mandates that the educational services provided to a minor "elsewhere than at a public school shall be at least substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides," and that such services must be provided by "competent" instructors. N.Y.Educ.Law § 3204(2) (McKinney 1981 & Supp.1988). Plaintiffs argue that § 3204 is unconstitutionally vague, violates both the establishment and free exercise clauses of the first amendment, offends due process, and is enforced through on-site visits by public school authorities which violate the right to privacy guaranteed by the fourth and fourteenth amendments. Plaintiffs seek injunctive and declaratory relief. Before the court are cross-motions for summary judgment.[1]

## I. BACKGROUND

The following facts are deemed undisputed.[2] Plaintiffs Randy and Alice Blackweld-

---

1. Plaintiffs also move for leave to file a second amended complaint, apparently relying on unspecified papers previously filed with the court. Because plaintiffs have failed to adhere to Rule 10(c) of the Rules of the United States District Courts for the Northern District of New York (the "Local Rules") in making this motion, the motion to amend is summarily denied.

2. The progress of this case has been hindered by plaintiffs' failure to adhere to the procedural framework of the Federal Rules of Civil Procedure and this court's Local Rules. The court has been indulgent—perhaps too indulgent—in forgiving a multitude of procedural errors, because it has not wanted to punish the individual plaintiffs for the shoddy motion practice of their attorneys. There comes a point, however, when forbearance of one party's carelessness unfairly prejudices their adversaries. That point has been reached in this case.

 Local Rule 10(j) unambiguously provides:

 Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue. All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party. The motion for summary judgment may be denied if the movant fails to annex the statement required by this Paragraph.

This rule serves the important purposes of narrowing the issues of dispute, focusing inquiry into areas of genuine controversy, and avoiding unnecessary waste of resources by the court and the other parties to the action. Plaintiffs' attorney should be aware of the existence of this rule; the other parties involved in this action as

er are the parents of two school age children, plaintiffs Carmon and Katherine Blackwelder. The Blackwelders reside within the jurisdictional boundaries of the Cato–Meridian Central School District ("Cato–Meridian District"). The Cato–Meridian District requires the conditional approval of all proposed alternative educational programs, including homeschooling programs, prior to the commencement of the academic year for which approval is sought. To obtain such conditional approval, a family wishing to educate their children at home must submit a proposed calendar, curriculum, list of textbooks, syllabus and standardized testing schedule (if appropriate) for review by a representative of the school district. That representative must also be apprised of the credentials and life and occupational experiences of the instructor or instructors who are to conduct the homeschooling program. Final approval of a homeschooling program in the Cato–Meridian District is contingent upon the results of a scheduled visit to the home where the alternative instruction is to be given by a team of representatives of the local Board of Cooperative Educational Services. Ordinarily, one or two scheduled on-site inspections are conducted during the school year. The Blackwelders have indicated that they wish to educate their children at home for religious reasons, but refuse to permit on-site visits, and indeed contend that the state does not have "jurisdiction" over their children's education.

Plaintiffs Stephen and Debora Standish reside within the jurisdictional limits of the City School District of Oswego ("Oswego District"). Because of their religious beliefs, the Standishes wish to educate their child, plaintiff Aaron Standish, in their home. The Oswego District's procedures for giving alternative education programs conditional and permanent approval parallel those of the Cato–Meridian District. On-site inspections are to be conducted by a school district representative or a mutually acceptable third party before final approval of a homeschooling program can be obtained. The Standishes do not recognize the jurisdiction of the Oswego District or the state to regulate their child's educational program, and have refused to cooperate with school district officials in order to gain approval for their homeschooling program.

Plaintiffs George and Hilda Lonneville similarly wish to have their children, plaintiffs Amy and Jacqueline Lonneville, educated in a homeschooling program. Like the other plaintiffs in this action, they are motivated by religious concerns, and do not recognize the state's right to approve or disapprove of the educational choices they make for their children. The Lonnevilles reside in the Waterloo Central School District ("Waterloo District"), which follows procedures comparable to those of the other school districts involved in this litigation in determining whether homeschooling programs should be given conditional and final approval. The Lonnevilles have not submitted standardized test scores to district officials nor permitted on-site visits by representatives of the Waterloo District.

On October 31, 1986 the original complaint was filed in this action. The named plaintiffs were the Blackwelders and the members two other families who have since dropped out of this case. The named defendants were Henry Safnauer, the Superintendent of the Cato–Meridian District, and two other district superintendents who were also dropped from this litigation after it began. On February 6, 1987, a motion for leave to file an amended complaint was granted.[3] The Standishes and the Lonne-

---

well as the court itself have repeatedly referred plaintiffs' attorney to the Local Rules, seemingly to no avail. Plaintiffs have failed to file a statement in compliance with Local Rule 10(j) either in opposition to defendants' motions for summary judgment or in support of their own cross-motion for summary judgment. Therefore, the court will consider the facts set out in defendants' Rule 10(j) statement as uncontested. The court will not deny plaintiffs' cross-motion for summary judgment because of their failure to file a Rule 10(j) statement, but will deem the facts set out in defendants' Rule 10(j) statement as admitted in addressing the merits of plaintiffs' cross-motion.

3. A number of amended complaints have been passed around in this action. Plaintiffs have obtained leave to file the first amended complaint *only*, and it is that pleading that controls in this action. *See, e.g., Washer v. Bullitt Coun-*

villes were added as party plaintiffs, and Edward Garno and Michael Hunsinger, Superintendents of the Oswego and Waterloo Districts, respectively, were added as defendants. On February 23, 1987, a motion by the State of New York for leave to intervene as a defendant in this action was granted. Subsequent to the commencement of this action, educational neglect proceedings[4] were commenced against the Blackwelders and the Standishes in the Family Court for the State of New York, Cayuga County and Oswego County, respectively. The same constitutional issues presented in this action have been raised in those state court proceedings. By order dated April 27, 1988, Judge Corning of the Cayuga County Family Court dismissed the educational neglect petition brought against the Blackwelders, finding that the Blackwelder children were receiving an education "substantially equivalent" to that offered in the public schools. *In re Sarah B.*, 528 N.Y.S.2d 759 (Fam.Ct.1988).[5] The Family Court proceedings against the Standishes are still pending.

Defendants urge this court to abstain from deciding the issues raised here, or in the alternative to grant summary judgment on the merits of plaintiffs' constitutional claims and to dismiss the amended complaint in its entirety. Plaintiffs cross-move for summary judgment on their claims, save for their claim under the free exercise clause of the first amendment.[6]

## II. DISCUSSION

### A. *Abstention*

As a preliminary matter, it must be determined whether the pendency of the Family Court proceeding against the Standishes requires the court to refrain from

---

*ty*, 110 U.S. 558, 562, 4 S.Ct. 249, 250–51, 28 L.Ed. 249 (1884); *International Controls Corp. v. Vesco*, 556 F.2d 665, 668–69 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978).

In the court's order granting plaintiffs' motion for leave to file the amended complaint, the court directed plaintiffs to "serve the amended complaint on all of the defendants within 30 days of the date of this order." *Blackwelder v. Safnauer*, No. 86–CV–1208, slip op. at 2 (N.D.N.Y. February 6, 1987). Though copies of the proposed amended complaint were served on the attorneys representing defendant Safnauer, the amended complaint was not served on Safnauer after the date of the above-quoted order. If it were not for the language contained in the court's February 6, 1987 order, service of the amended complaint on the attorneys for this defendant—over whom the court had already obtained personal jurisdiction—would have been sufficient under Fed.R.Civ.P. 5(b). *See, e.g., Roberts v. Husky Industries, Inc.*, 71 F.R.D. 479, 480 (E.D.Tenn.1973); *Walters v. Boyd*, 187 F.Supp. 479, 480–81 (S.D.Tex.1960); 2 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 5.04 (1987). Since it is possible that plaintiffs' attorney misunderstood the February 6 order and believed that service on the newly named defendants within thirty days of the date of the order was all that was required, the court will not penalize plaintiffs for their failure to serve defendant Safnauer in accordance with that order. Since no additional factual allegations relevant to the claims against Safnauer was included in the amended complaint, the court will treat Safnauer's answer to the original complaint as his answer to the amended pleading.

4. In New York, a "neglected child" is defined as a child under the age of eighteen

"whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care (A) in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law, ... though financially able to do so or offered financial or other reasonable means to do so ..."

N.Y.Fam.Ct.Act § 1012(f)(i)(A) (McKinney 1983). Part I of Article 65 of New York's Education Law covers the state's compulsory education provisions, *see* N.Y. Educ.Law §§ 3201–3234 (McKinney 1981 & Supp.1988), and includes within it the provision of the Education Law which plaintiffs now challenge on constitutional grounds.

5. Though Judge Corning touched upon the constitutional concerns raised by the Blackwelders in this case, the disposition of the Family Court proceeding seems to rest entirely upon the application of state law. Consequently, the court finds that Judge Corning's decision does not have preclusive effect with regard to the federal constitutional claims at issue here.

6. Also before the court is a motion by the New York School Boards Association, Inc. and the New York State United Teachers, AFL–CIO, for leave to file an *amici curiae* brief. This motion is granted, and the Clerk is directed to file the proposed *amici curiae* brief submitted by those organizations.

exercising jurisdiction over any or all of the claims raised in this case under the doctrine of abstention. The abstention "doctrine"—in reality a series of equitable doctrines inspired by concerns of comity and federalism—constitutes "an extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). The various categories of abstention "are not watertight," *Law Enforcement Ins. Co., Ltd. v. Corcoran*, 807 F.2d 38, 40 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987), nor are they "rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987). The court must balance these factors "in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 21, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). That abstention from the exercise of a federal court's jurisdiction remains "the exception, not the rule" is a fundamental truism that must always be kept in mind when determining whether the doctrine is applicable under a particular set of facts. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

Despite the heavy presumption favoring the exercise of this court's jurisdiction, there are certain matters that so closely implicate the core sovereign concerns of the states that a federal court must abstain from deciding even serious constitutional questions if the exercise of federal jurisdiction would greatly interfere with those sovereign interests. Defendants urge that child neglect proceedings affect interests of such import to the states that abstention under the principles of federalism explicated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is mandated. With respect to the claims of the Standishes, the court agrees that abstention is mandated by *Younger* and its progeny. With respect to the claims of the remaining parties, however, the court finds abstention inappropriate.

■ In *Younger*, the Supreme Court held that a federal court cannot, absent exceptional circumstances, enjoin a pending state criminal prosecution. *Id.* at 53, 91 S.Ct. at 755. At least two basic policy considerations have come to be associated with the *Younger* doctrine.[7] First, there is "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44, 91 S.Ct. at 750. This principle is equally applicable when declaratory relief rather than injunctive relief has been sought from a federal court while a parallel state court criminal proceeding is pending, since "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the longstanding policy limiting injunctions was designed to avoid." *Samuels v. Mackell*, 401

---

7. A third consideration, not expressly discussed in *Younger* itself, has become associated with the *Younger* doctrine. The jurisprudential aversion to advisory opinions cautions against rendering decision on federal constitutional questions which could be raised in a pending state court proceeding. *Pennzoil*, 107 S.Ct. at 1526. When a state statute is challenged on federal constitutional grounds, "a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless." *Moore v. Sims*, 442 U.S. 415, 428, 99 S.Ct. 2371, 2380, 60 L.Ed.2d 994 (1979). A similar concern underlies the line of cases spawned by *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Pennzoil*, 107 S.Ct. at 1526 n. 9. For the reasons discussed in the text, *infra* at 119–20, where the court addresses the applicability of the *Pullman* doctrine to this case, the court believes that this third policy consideration that has become associated with *Younger* is not seriously implicated in the instant lawsuit.

U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971).

 The *Younger* Court also discussed "an even more vital" reason to refrain from interfering with an ongoing state criminal proceeding:

[The Court's decision] is reinforced by ... the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

401 U.S. at 44, 91 S.Ct. at 750. These comity and federalism concerns, of course, are at the heart of the *Younger* doctrine, and have been the justification for the extension of the doctrine to cases in which non-criminal state proceedings might be disrupted by an adjudication in a federal court. Thus, the principles underlying *Younger* have been found equally relevant when determination of a claim brought in

federal court would disrupt ongoing civil proceedings conducted by state tribunals when those proceedings implicate important state interests.[8] The general rule remains, however, that separate in personam actions involving identical parties may proceed concurrently in federal and state court. *McClellan v. Carland,* 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910). Before the *Younger* doctrine comes into play, at least three conditions must be present: an "important," "substantial," or "vital" state interest must be at stake in the state proceeding, the state proceeding must afford the parties involved in the concurrent federal litigation an adequate opportunity to raise their federal claims, and there must be an "on-going" state proceeding with which a federal court decree would interfere. *Middlesex Ethics Committee,* 457 U.S. at 432, 102 S.Ct. at 2521; *Moore v. Sims,* 442 U.S. 415, 423–25, 99 S.Ct. 2371, 2377–78, 60 L.Ed.2d 994 (1979). All three prerequisites are present in the case at bar.

The requirement that a substantial state interest be implicated before *Younger* abstention is invoked directly reflects the comity and federalism concerns that are the doctrine's basic justification. Particularly relevant in this regard to the case at bar is *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, where the Supreme Court found that on-going child abuse proceedings in which the state was a party were proceedings " 'in aid of and closely related to criminal statutes,' " *id.* at 423, 99 S.Ct. at 2377 (quoting *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed. 2d 482 (1975)), and thus a constitutional challenge to a state's practice of removing suspected child abuse victims from parental custody without notice pending the hearing on the abuse charge could not be

---

**8.** *See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (federal court should have abstained when religious school sought to enjoin state administrative hearing on sex discrimination claim); *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (federal court should abstain from considering constitutional challenge to attorney disciplinary rules that are subject of pending state disciplinary proceeding); *Juidice v. Vail,* 430 U.S. 327,

97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state interest in vindicating orderly operation of its judicial process through contempt sanctions deemed sufficiently important to invoke *Younger*); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (federal court should abstain from deciding constitutional challenge to nuisance statute prohibiting exhibition of "obscene" films in face of on-going state nuisance proceedings, since challenged nuisance law implicated interests "closely related" to concerns underlying criminal laws).

entertained in light of *Younger*. Though the educational neglect proceeding involving the Standishes does not involve the state's compelling interest in preventing the continued physical abuse of a child, it nonetheless is not so far removed from the type of proceedings involved in *Moore* that that case should not be deemed controlling. In *Moore*, the Supreme Court noted that "[f]amily relations are a traditional area of state concern." 442 U.S. at 435; *see also DeSpain v. Johnston*, 731 F.2d 1171, 1179 (5th Cir.1984) (child abuse proceeding); *Williams v. Williams*, 532 F.2d 120 (8th Cir.1976) (adoption proceeding). Indeed, the rights and duties of parents and children have long been considered matters of chiefly local concern that implicate fundamentally important state interests. *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Williams*, 532 F.2d at 122. It seems clear that the neglect proceedings involving the Standishes affect vital and significant state interests.

The requirement that the parties must be able to assert their federal claims in the state proceeding gives force to the equity principles which were an important part of the development of the *Younger* doctrine. The availability of an adequate remedy at law makes the exercise of equitable jurisdiction less advisable. In the present case, the same constitutional arguments that are raised here can be asserted by the Standishes in the Family Court proceeding in which they are involved.

■ Finally, for the *Younger* doctrine to apply in this case, there must be an "on-going state proceeding" with which a federal court adjudication of plaintiffs' claims for injunctive and declaratory relief would interfere. As one court observed, "[t]iming is crucial to the applicability of *Younger*." *DeSpain*, 731 F.2d at 1177. When a state proceeding is pending at the time a federal complaint is filed, that proceeding is clearly an "ongoing state proceeding" within the meaning of *Younger*. The *Younger* doctrine has not been limited, however, to cases in which state proceedings predate the federal action. In *Hicks v. Miranda*,

422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Supreme Court held that where state proceedings are commenced against the plaintiffs in a federal action after the filing of the federal complaint "but before any proceedings of substance on the merits have taken place in the federal court," the *Younger* principles "should apply in full force." *Id.* at 349, 95 S.Ct. at 2292.

■ Whether "proceedings of substance on the merits" occurred in this case prior to the institution of the Family Court actions is a close question. It is clear that a denial of a temporary restraining order by the federal court prior to the commencement of a state action does not sufficiently advance the federal lawsuit that abstention under *Younger* is unwarranted, for that was the procedural posture of the *Hicks* case. On the other hand, the issuance of a preliminary injunction by the federal court before state proceedings are begun does amount to "proceedings of substance on the merits," foreclosing the application of *Younger*. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 238, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929–31, 95 S.Ct. 2561, 2566–68, 45 L.Ed.2d 648 (1975). There is authority to the effect that the *denial* of preliminary injunctive relief, at least after an extended evidentiary hearing, constitutes "proceedings of substance on the merits" within the meaning of *Hicks*. *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1350–51 (9th Cir. 1985); *Red Bluff Drive–In, Inc. v. Vance*, 648 F.2d 1020, 1033 (5th Cir.1981), *cert. denied*, 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982). In the instant case, the court granted a motion by plaintiffs for leave to file an amended complaint and granted a motion by the State of New York to intervene before state educational neglect proceedings were commenced. These motions did not substantially involve the court in the merits of the underlying constitutional issues raised here, and the court finds that they are not the sort of proceedings contemplated by *Hicks*. Though it is true that the complaint in this action was filed months before the commencement of the neglect proceedings, it is equally true

that plaintiffs, largely because of various procedural snafus, *see supra* note 2, were unable to present the merits of their case to the court prior to the institution of state proceedings. Therefore, the court finds that the requirement that there be an "ongoing state proceeding" before *Younger* abstention is invoked has been satisfied under the facts of this case.

 Having found that the three conditions discussed above are present, the court must abstain from hearing the claims of the Standishes, at least, unless one of the limited exceptions to *Younger* are applicable. *DeSpain*, 731 F.2d at 1180. A federal court should not abstain under *Younger* when the state proceeding was brought in bad faith or as a means to harass the federal plaintiffs, or when other "extraordinary circumstances" necessitate federal judicial intervention.[9] Plaintiffs allege that the Family Court proceedings initiated against the Blackwelders and Standishes were instituted at the insistence of the attorneys for the defendant superintendents in retaliation for bringing this lawsuit. The neglect proceedings brought against the Blackwelders and the Standish-es, however, were initiated by the local districts of New York's Department of Social Services for Cayuga County and Oswego County, respectively, and not the defendant superintendents or their representatives. Indeed, school superintendents are not empowered to unilaterally originate such neglect proceedings.[10] Even if the court were to find that the defendant superintendents were impelled by evil motives in notifying the Department of Social Services that the plaintiff children were not enrolled in an approved alternative education program, a conclusion not supported by the record, the court would be unable to find that the neglect proceedings themselves were instituted in bad faith, since there is no reason to believe that the local social services agencies involved had any interest in punishing plaintiffs for bringing this lawsuit in federal court. Nor are other "extraordinary circumstances" justifying federal judicial intervention present in this case. Plaintiffs do not challenge a statute that is so " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph,' " *Younger*, 401 U.S. at 53, 91 S.Ct.

---

9. The traditional showing that must be made to obtain equitable relief is "irreparable injury." Such a showing is not enough when the comity principles underlying *Younger* are implicated, since it is assumed that "state courts will adhere to constitutional standards, and the mere possibility of erroneous application of those standards will not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings." *DeSpain*, 731 F.2d at 1180 n. 22 (quotation omitted). Instead, a showing of "great and immediate" irreparable injury must be made to overcome the comity considerations upon which *Younger* abstention is founded. *See* 401 U.S. at 46, 91 S.Ct. at 751; *see also Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). A showing of bad faith or harassment in the institution of a criminal or "quasi-criminal" proceeding (such as a neglect proceeding, at issue in the instant case) constitutes "great and immediate" irreparable injury in and of itself. *See, e.g., Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir.), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). The Supreme Court has indicated that a showing of "great and immediate" irreparable injury might also be established by demonstrating that "[o]ther unusual situations calling for federal intervention" exist. *Younger*, 401 U.S. at 54, 91 S.Ct. at 755.

10. Under New York law, abuse or neglect proceedings may only be instituted by a "child protective agency" or a person who has obtained prior authorization from the Family Court to originate such a proceeding. N.Y. Fam.Ct.Act § 1032 (McKinney 1983 & Supp. 1988). A "child protective agency" is defined as "any duly authorized society for the prevention of cruelty to children or the child protective service of the appropriate local department of social services or such other agencies with whom the local department has arranged for the provision of child protective services under the local plan for child protective services." N.Y.Fam.Ct.Act § 1012(i) (McKinney 1983 & Supp. 1988); *see also* N.Y. Soc. Serv. Law § 423 (McKinney 1983 & Supp. 1988). As the New York Court of Appeals recently noted, "[t]he requirement for court approval or authorization for proceedings prompted by those other than child protective agencies indicates the Legislature's concern that judicial proceedings touching the family relationship should not be casually initiated and imposes upon the courts the obligation to exercise sound discretion before permitting such petitions to be filed." *Weber v. Stony Brook Hospital*, 60 N.Y.2d 208, 212, 469 N.Y.S.2d 63, 65, 456 N.E.2d 1186, 1188 (1983) (per curiam), *cert. denied*, 464 U.S. 1026, 104 S.Ct. 560, 78 L.Ed.2d 732 (1983).

at 755 (quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)), that immediate relief must be afforded by a federal court, and no other reason for not abstaining has been suggested by plaintiffs.

In light of the foregoing, the court concludes that the *Younger* doctrine compels it to refrain from deciding the claims made by the Standishes, and consequently their claims against defendant Garno are dismissed. *See Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973). More problematical is the application of *Younger* to the claims of the other families involved in this lawsuit. Neglect proceedings are not pending against either of these families.[11] As a general proposition, abstention is mandated under *Younger* only when the federal plaintiff is actually a party to the state proceeding; the doctrine does not bar nonparties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928–29, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975); cf. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). An exception to this rule comes into play when "legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." *Doran*, 422 U.S. at 928, 95 S.Ct. at 2566. When the interests of a federal plaintiff and a party involved in a pending state proceeding are so "intertwined" that the federal plaintiff can vindicate his rights in the pending state proceeding, those parties may be treated as one in applying *Younger* principles. Such a close relationship between the parties does not exist here, even though plaintiffs are represented by the same attorney, hold similar religious beliefs, and resist state interference with the home instruction of their children for similar reasons. The individual rights of the Blackwelders and Lonnevilles have not merged legally with those of the Standishes; members of the former two families cannot intervene in the pending Family Court proceeding involving the Standishes in order to have their constitutional claims heard, and thus the *Younger* doctrine does not bar this court from entertaining those claims.[12]

The claims of the remaining plaintiffs are not barred by the policy considerations underlying *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The *Pullman* abstention doctrine requires a federal court to stay a federal action raising a substantial federal constitutional issue when a state court's interpretation of an unclear state law could render resolution of the constitutional question unnecessary. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). In such cases, delaying decision might

---

**11.** Neglect proceedings have not been instituted against the Lonnevilles. A petition was filed against the Blackwelders, but the Family Court for Cayuga County has dismissed the petition, *see In re Sarah B.*, 528 N.Y.S.2d 759 (1988), and this determination has not been appealed.

**12.** Though there are no neglect proceedings pending against these plaintiffs, the court concludes that they do have standing to maintain this action. To satisfy the "case or controversy" requirement of Article III of the Constitution, "the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The State of New York clearly intends to enforce the requirements of its Education Law, including the provision challenged here, as is demonstrated by the institution of neglect proceedings against the Blackwelders and Standishes. The Blackwelders and Lonnevilles have been equally unambiguous in their intention not to allow on-site visits or otherwise comply with the defendants' attempts to enforce the mandate of § 3204 of the Education Law. Therefore, the threat of possible future neglect proceedings against those plaintiffs is more than a mere speculative possibility. Cf. *Trucke v. Erlemeier*, 657 F.Supp. 1382, 1387 (N.D.Iowa 1987) ("While a past prosecution of the plaintiffs [for violation of an Iowa compulsory attendance law] does not always create standing [in an action challenging the law], it is a relevant indication of the State's willingness to prosecute and the plaintiffs' willingness to risk prosecution.").

"avoid both unnecessary adjudication of federal questions and 'needless friction with state policies.'" *Id.* (quoting *Pullman,* 312 U.S. at 500, 61 S.Ct. at 645). The Second Circuit has identified "three essential conditions" which must be present before *Pullman* abstention is properly invoked: (1) the state law that is the subject of a constitutional challenge must be ambiguous or uncertain; (2) resolution of the federal issues raised must depend on the construction given the state law at issue; and (3) the state law must be "susceptible of an interpretation that would avoid or modify the federal constitutional issue." *McRedmond v. Wilson,* 533 F.2d 757, 761 (2d Cir.1976); *see also West v. Village of Morrisville,* 728 F.2d 130, 133–34 (2d Cir. 1984).

■■■ The provision of New York's Education Law that is challenged in this litigation has been the subject of considerable case law in New York's state courts, and is part of a well-developed system of assessing alternative educational programs. *See* text, *infra* at 121–25. Interpretation of the requirements of § 3204 of the Education Law by the courts of the State of New York has been basically consistent. In addition, the portions of subdivision 2 of § 3204 that are challenged here have remained unchanged since the statute's enactment in 1947, *see* 1947 N.Y. Laws ch. 820, § 3204; *see also People v. Turner,* 277 A.D. 317, 98 N.Y.S.2d 886 (4th Dept.1950), and are derived from New York's compulsory education act of 1894. *See* 1894 N.Y. Laws ch. 671; *see also In re Falk,* 110 Misc.2d 104, 107, 441 N.Y.S.2d 785, 788 (Fam.Ct.1981). Abstention seems particularly inappropriate when a constitutional challenge is made to a statute that has "been on the books" for such a substantial period, has not become dormant through lack of enforcement, and has been the subject of a number of largely consistent state court decisions. *Sherr v. Northport–East Northport Union Free School*

*District,* 672 F.Supp. 81 (E.D.N.Y.1987). Under such circumstances, the state law implicated by the constitutional challenge cannot be fairly deemed "unsettled." Further, though the highest court in the state system, the New York Court of Appeals, has not spoken on the proper construction to be given § 3204(2) nor addressed the issues plaintiffs raise here, it does not appear likely that the constitutional questions raised in this action would be avoided or modified by a construction given § 3204(2) that differs from that prevailing among New York's lower courts, with the possible exception of the vagueness challenge to the statute, discussed *infra* at 121–28. On this basis, the court concludes that the *Pullman* abstention doctrine does not provide justification for avoidance of the issues raised made by the Blackwelders and Lonnevilles.

■■■ Though none of the recognized categories of abstention apply to the claims of the remaining families,[13] the Supreme Court has indicated that under "exceptional circumstances" a federal district court may, in deference to ongoing parallel state proceedings, decline to exercise jurisdiction over federal claims otherwise properly before it if necessary to further the interest of " '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed.2d 200 (1952)). *Colorado River* establishes a discretionary power in the district courts which must be exercised with certain specified considerations in mind. Among those considerations, as recently summarized by the Second Circuit, are:

> the assumption by either the state or federal court of jurisdiction over any res

---

**13.** Resolution of the claims raised in this case would not interfere with a state's endeavors to maintain a consistent policy or approach in an area that is the subject of a comprehensive regulatory scheme. *See Burford v. Sun Oil Co.,* 319

U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Law Enforcement Ins. Co., Ltd. v. Corcoran,* 807 F.2d 38, 43–44 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987).

or property, the inconvenience of the federal forum, the avoidance of piecemeal litigation, the order in which jurisdiction was obtained, whether federal or state law provides the rule of decision, and whether the state court proceeding will adequately protect the rights of the party seeking to avail itself of federal court jurisdiction.

*American Disposal Services, Inc. v. O'Brien,* 839 F.2d 84, 87 (2d Cir.1988) (citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 15–16, 23–27, 103 S.Ct. 927, 937, 941–43, 74 L.Ed.2d 765 (1983)); *see also Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.,* 800 F.2d 325, 327 (2d Cir.1986). These factors are to be considered by this court "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. at 937.

■ The court concludes that dismissal under *Colorado River* is inappropriate in the case at bar.[14] There is no property or res involved in this litigation, and thus the exercise of this court's jurisdiction would not tend to impede or embarrass a state court in its handling of a case in which it has already asserted control over the tangible subject matter of a dispute. *See Law Enforcement Ins. Co., Ltd. v. Corcoran,* 807 F.2d 38, 41–42 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). There is no indication that the federal forum is any more or less convenient for the parties involved in this action than the Family Court. Since the Blackwelders and Lonnevilles are not parties to the state court proceedings, they are not bound by any determinations made there, and thus addressing the merits of their claims here will not create "piecemeal litigation" that could otherwise be avoided. Federal law provides the rule of decision in this case. Since they do not have standing to advance their position in the Family

Court proceedings involving the Standishes, it cannot be said that those proceedings will adequately protect the rights of the non-party families. Therefore, the court must reach the merits of the issues raised in this lawsuit.

### B. *Vagueness*

Plaintiffs maintain that New York's compulsory education law, at least as applied to those who desire to educate their children at home because of religious concerns, is impermissibly vague. They argue that New York's requirement that minors taught outside the public school system must receive instruction from a "competent" teacher that is at least "substantially equivalent" to that provided students in public schools fails to provide sufficiently concrete standards of conduct for those who wish to educate their children at home. Further, plaintiffs contend that the manner in which the state evaluates homeschooling programs gives the superintendents of the numerous local school districts throughout the state unbridled discretion in determining whether a particular program provides the statutorily required level of instruction.

Whether the language of § 3204 of the Education Law is sufficiently definite to pass scrutiny under the due process clause of the Constitution cannot be determined in a vacuum; the requirements of New York's compulsory education laws must be assessed as a whole, extending full consideration to regulatory refinements and any limiting construction given by an appropriate enforcement agency or state court. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982); *Grayned v. City of Rockland,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). Consequently, the court must review the relevant statutory and regulatory framework affecting

---

**14.** *But see Deakins v. Monaghan,* —— U.S. ——, 108 S.Ct. 523, 533 n. 5, 98 L.Ed.2d 529 (1988) (White, J., concurring) (citing *Colorado River* in support of the proposition that it would be "prudent" for district court to stay the adjudication of claims brought by three plaintiffs who were not under indictment when those claims were

"virtually indistinguishable" from those raised by three other plaintiffs who were indicted subsequent to the bringing of their federal action, after suggesting that the claims of the latter group of plaintiffs should be stayed under *Younger* ).

the content of any homeschooling program plaintiffs may wish to institute or join, as well as New York case law construing those statutes and regulations.

New York's compulsory education law mandates that "[i]n each school district of the state, each minor from six to sixteen years of age shall attend upon full time instruction," N.Y. Educ. Law § 3205(1)(a) (McKinney 1981), and imposes upon the parents or guardians of such a child a statutory duty to assure that the child receives the instruction mandated by New York law. N.Y.Educ.Law § 3212(2)(b) (McKinney 1981 & Supp. 1988). Nothing in New York's compulsory education scheme prohibits parents from providing their children with a "systematic course of study" in their own home. *In re Walker*, 69 Misc.2d 400, 403, 330 N.Y.S.2d 8, 12 (Fam.Ct.1972); *see also In re Franz*, 55 A.D.2d 424, 427, 390 N.Y.S.2d 940, 942 (2d Dept.1977); *People v. Turner*, 277 A.D. at 319, 98 N.Y.S.2d at 888; N.Y. Educ.Law § 3204(1) (McKinney 1981). However, state law requires that "[i]nstruction given to a minor elsewhere than at a public school shall be at least substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides." N.Y. Educ.Law § 3204(2) (McKinney 1981 & Supp.1988). Concomitant with this requirement is that instruction outside the public schools must be given by a "competent" teacher. *Id.* A parent whose child does not attend a public or parochial school in the city or district in which the parent resides must furnish proof that the child "is attending upon required instruction elsewhere," and the failure to provide such proof raises a presumption that the child is not receiving the required instruction. N.Y.Educ.Law § 3212(2)(d). This presumption can be overcome by evidence that the child is receiving instruction "substantially equivalent" to that offered at the public schools of the city or district where the child resides, but the failure to come forward with such evidence can result in a finding of educational neglect. N.Y.Fam.

Ct.Act § 1012 (f)(i)(A) (McKinney 1983);[15] *In re Christa H.*, 127 A.D.2d 997, 997, 513 N.Y.S.2d 65, 65 (4th Dept.1987); *In re Andrew "TT"*, 122 A.D.2d 362, 364, 504 N.Y.S. 2d 327, 328 (3d Dept.1986).

The primary responsibility for ensuring compliance with the requirements of the compulsory education law rests with the local boards of education for the various school districts throughout New York, *In re Adam D.*, 132 Misc.2d 797, 801, 505 N.Y.S.2d 809, 812 (Fam.Ct.1986), and the superintendent of schools in each district commonly acts as agent for the boards in carrying out this responsibility. The local boards of education have the initial responsibility of determining whether an alternative educational program, including a homeschooling program, provides instruction substantially equivalent to that provided in the public schools in their own districts. *In re Adam D.*, 132 Misc.2d at 801, 505 N.Y.S. 2d at 812 (citing New York State Education Dept., *Guidelines on Home Instruction* (Sept.1985)). Such determinations are subject to review by the Commissioner of Education of the State of New York. *In re Adam D.*, 132 Misc.2d at 803, 505 N.Y.S.2d at 813.

Any determination of the "substantial equivalency" of at-home instruction necessarily must take into account the statutes and regulations that govern public education in the State of New York. New York's public schools must remain in session for a minimum of 190 days per school year, including legal holidays, and minors educated "elsewhere than at a public school" must attend for at least as many hours per school year as are required for public schoolchildren. N.Y. Educ.Law §§ 3204(4)(a), 3210(2)(a). Attendance records must be maintained, N.Y. Educ. Law § 3211, and detailed guidelines for recordkeeping is provided in regulations promulgated by New York's Department of Education ("the Department"). 8A N.Y. Comp. Codes R. & Regs. ("NYCRR") Part 104 (1988).

State law establishes certain minimum instructional requirements that must be

---

**15.** *See supra* note 4.

satisfied by the local public school districts. For example, New York requires its public schools to instruct students in a wide variety of matters with an eye toward preparing those students "for participation as citizens" and "inculcating fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979). Thus, the state requires instruction in "patriotism and citizenship," N.Y.Educ.Law § 801 (McKinney 1969), instruction in the history and significance of the state and federal constitutions as well as the Declaration of Independence, *id.*, the teaching of civics and New York state history, N.Y.Educ.Law § 3204(3) (McKinney 1981), instruction relating to the flag, N.Y.Educ.Law § 802 (McKinney 1969), training in fire and arson prevention, highway safety, and the conservation of natural resources, N.Y.Educ.Law §§ 801, 806–08 (McKinney 1969), and health education regarding drugs, alcohol and cigarettes, N.Y.Educ.Law § 804 (McKinney 1969). *See generally* 8A N.Y.C.R.R. § 100.2(c).

General guidelines for the substantive content of the studies of public schoolchildren are also outlined by the state. In grades one through six, students attending public schools in New York must "receive instruction in arithmetic, reading, spelling, writing, the English language, geography, United States history, science, health education, music, visual arts, physical education and, where student need is established, bilingual education and/or English as a second language." 8A N.Y.C.R.R. § 100.3; *see also* N.Y.Educ. Law § 3204(3). Though detailed regulations for health education and physical education are provided, *see* 8A N.Y.C.R.R. §§ 135.3(b), 135.4(c)(2)(i), generally the local school boards are afforded wide leeway at the elementary school level in determining the scope and depth of instruction in a particular discipline. Instead of mandating adherence to a detailed and uniform curriculum, the state has opted to set out general educational goals for students in grades prekindergarten through six, *see* 8A N.Y.C.R.R. § 100.3(a)(1), leaving to the local boards of education the responsibility for establishing specific educational requirements. *See* N.Y.Educ.Law § 1709(33) (McKinney 1969).[16] This allows flexibility in addressing unique local problems, enhances responsiveness to the educational concerns of the communities within a particular school district, and respects this nation's tradition of vesting primary control over educational policy with local authorities. The state monitors the progress of elementary school age children through periodic testing, 8A N.Y.C.R.R. § 100.3(b)(2), and these examinations must conform to certain requirements designed in part to assure uniformity, so that the effectiveness of the various approaches of the local school districts can more meaningfully be assessed. Children being taught at home must take the same pupil evaluation tests in reading, writing and mathematics that are administered to public schoolchildren. 8A N.Y.C.R.R. § 100.3(b)(2)(ii).

The state has established more detailed program requirements for students in the state's secondary schools. For example, all public school students attending grades seven and eight must complete two "units of study" in English, two units of study in the social sciences, two units of study in the physical sciences, two units of study in mathematics, and one-half unit of study each in art and music. 8A N.Y.C.R.R. § 100.4(b)(2). A "unit of study" is defined as 180 minutes of instruction per week throughout the school year. 8A N.Y.C.R.R. § 100.1(a). At the high school level, there are similarly detailed specifications of minimum "units of study" in basic subjects that must be completed successfully before a student can receive a high school diploma. *See* 8A N.Y.C.R.R. § 100.5. Nonetheless, though the state regulations con-

---

**16.** Subdivision 33 provides in general terms that local school boards are "[t]o have in all respects the superintendence, management and control of the education affairs of the [school] district, and, therefore, shall have all the powers reason-ably necessary to exercise powers granted expressly or by implication and to discharge duties imposed expressly or by implication by [the Education Law or other statutes]." N.Y. Educ. Law § 1709(33).

cerning secondary education are considerably more detailed than those governing the primary schools, the scope and depth of instruction are not specified. Again, the state has opted to entrust the details of public education with the local school boards.

Given the deference to local school districts that characterizes New York's approach to the establishment of specific substantive educational requirements for its public schoolchildren, it is not surprising that the New York State Department of Education has not issued binding regulations governing homeschooling.[17] In 1985, however, the Department did promulgate advisory guidelines concerning the establishment of a home instruction program. *See* New York State Education Dept., *Guidelines on Home Instruction*, Sept. 1985 (hereinafter "The Guidelines") (Copy attached as Exh. A of Affidavit of Deborah H. Karalunas). While stressing that the issue of home instruction is best "dealt with locally," the Department drew upon the past experiences of various districts in formulating "recommendations for effective practices." *Id.* at i. The Department recommends that parents wishing to educate their children at home should immediately arrange a meeting with the superintendent of the school district in which they reside or some other representative of the school district. Parents are advised to "acquire information on the subjects which must be taught at various ages and grade levels" from the superintendent or from the Department itself. *Id.* at 4. Parents are urged to "allow ample time for the approval process to take place prior to beginning home instruction," since removing their children from school and placing them in an unapproved homeschooling program could "be found to be a violation of Education Law." *Id.*[18]

17. Plaintiffs have advised the court that the Department of Education has proposed new regulations governing home instruction and the evaluation of homeschooling programs. As of this writing, the court has not been advised whether those proposed regulations have been adopted by New York's Board of Regents, and consequently the court will restrict its analysis to the regulations in effect at the time this lawsuit was filed.

18. Plaintiffs argue that the language contained in the Guidelines and quoted in the text appears to be a misstatement of New York law, since there is no statutory or regulatory requirement that a parent obtain the permission of the school board for the district in which they reside or the district's superintendent before removing a child from a public school. This point is more fully explained in a decision by New York's Commissioner of Education:

It is strongly recommended that a parent or guardian of a child who is to be educated at home or in a nonpublic school unknown to local school officials advise the superintendent of schools of his or her intention to have the child educated outside of the public school system, so that parent or guardian can be informed of the requirements of the compulsory attendance law. However, there is no statutory requirement that a parent or guardian obtain the consent of a superintendent of schools or board of education before removing a child from a public school. When a child between the ages of six and sixteen does not attend school, *and* school officials conclude that the child is not receiving a proper instructional program, the school district must then take steps to enforce the compulsory attendance law, which may include [bringing educational neglect charges to the attention of the Department of Social Services].

If upon review of the home instruction program [the parent or guardian] is providing her children, [the superintendent] concludes that the [child] is not receiving a sufficient educational program at home, and if [the parent or guardian] does not alter the program to provide the elements necessary for such program to be substantially equivalent to that offered in [public] schools, then [the superintendent] would be obliged to seek enforcement of the compulsory attendance law. However, the superintendent of schools should base a determination as to substantial equivalency of instruction upon an evaluation of the instruction *actually furnished* by [the parent or guardian] to her children.

*Matter of Raeder–Tracy,* —— Ed. Dept. Rep. ——, No. 11819, slip op. at 2 (May 14, 1987) (emphasis added). The court does not attach the same significance to this alleged discrepancy between the Guidelines and the Commissioner's opinion as do plaintiffs. First, it does not appear to this court that the Guidelines, when read as a whole, suggest that the act of removing a child from public school before obtaining approval for an alternative educational program would, in and of itself, constitute grounds for the institution of neglect proceedings. Second, even if such a suggestion were contained in the Guidelines, those Guidelines are represented to be merely precatory. In no way do they presume to *require* parents to obtain the permission of local school officials before taking their children out of the public school system.

The Guidelines delineate the type of information that should be supplied to the local superintendent when approval for a homeschooling program is sought. This information includes a plan of instruction and a calendar for the year, syllabi and a list of materials or textbooks to be used, a description of the background, experience and credentials of the teacher, and a plan for evaluating the academic progress of the child being taught at home. *Id.* Parents are advised of the requirement of periodic testing necessary to evaluate the progress of the home-educated child. *Id.* at 5–6. If after completing his review of the proposed home instruction program the superintendent concludes that the program is unacceptable, the Guidelines recommend that the superintendent set out in writing the deficiencies of the proposed program, and it is recommended that parents be given an opportunity to redesign the program in order to correct the problems identified by the superintendent. *Id.* at 9. If the revised program still does not satisfy the superintendent, it is recommended that the parents be given an opportunity to challenge the superintendent's findings at a hearing before the local board of education. *Id.* The Guidelines advise parents of their right to appeal an adverse determination by the board to the Commissioner of Education. *Id.* If, on the other hand, a proposed homeschooling program meets with the superintendent's approval, the Guidelines recommend that on-site visits by school officials be conducted at least once or twice during the school year while instruction is taking place. *Id.* at 6, 9. The Guidelines recommend that a homeschooling program be reevaluated by the superintendent on an annual basis, and that the progress of the child taught at home should be monitored through both state-mandated pupil evaluation tests as well as optional standardized tests. *Id.* at 10, 12.

The Supreme Court has recognized that when a state law is challenged as unconstitutionally vague, at least two distinct principles of due process are implicated.

First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockland,* 408 U.S. at 108–09, 92 S.Ct. at 2299 (citations omitted). In evaluating whether a particular rule of conduct fails to establish sufficiently definite guidelines, the court must be mindful that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193. For example, when the first amendment rights of expression or association are implicated by the enforcement of a statutory or regulatory rule of conduct, the state will be held to a higher standard of specificity than might be the case if purely economic regulation was at issue. *See, e.g., Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. at 1193; *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974); *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). Further, greater precision is required when possible criminal or "quasi-criminal" penalties are contemplated, because in such cases "the consequences of imprecision" are qualitatively more severe. *Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. at 1193; *see Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Because plaintiffs failure to ensure that their children receive an education "substantially equivalent" to that offered in public schools within the meaning of § 3204 could

subject them to educational neglect charges, the court finds that a more stringent test for vagueness should be applied than would be necessary for strictly economic regulation.

▆▆▆▆ The nature of the court's inquiry is also influenced by whether the allegedly vague law is being attacked facially or as applied. Ordinarily, a state law is unconstitutionally vague on its face when its requirements are "expressed in terms of such generality that 'no standard of conduct is specified at all.'" *Brache v. County of Westchester,* 658 F.2d 47, 51 (2d Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982) (quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971)). If a law "has a core meaning that can reasonably be understood, then it may validly be applied to conduct within the core meaning, and the possibility of such a valid application necessarily means that the statute is not vague on its face." *Brache,* 658 F.2d at 51; *see also Smith v. Goguen,* 415 U.S. 566, 577–78, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974). Absent a showing that a law is "impermissibly vague in all of its applications," *Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. at 1193, a vagueness challenge can succeed only if plaintiffs demonstrate that the law is impermissibly vague as applied to activities in which they are actually engaged. *Id.* at 495, 102 S.Ct. at 1191–92; *Parker v. Levy,* 417 U.S. at 757, 94 S.Ct. at 2562; *Welch v. United States,* 750 F.2d 1101, 1111 (1st Cir.1985). In the case at bar, a successful facial challenge cannot be made under this standard of review, because however uncertain the terms "competent" and "substantially equivalent" may be, it is beyond dispute that a parent who withdrew his or her child from public school and afforded that child no education whatsoever would be in violation of the compulsory education law.[19] Consequently, the court's inquiry will focus on the manner in which § 3204 is applied in the school districts within which plaintiffs reside.[20]

▆▆▆▆ The terms "competent" and "substantially equivalent" are not in and of themselves "so lacking in meaning as to be

19. An exception to the limited scope of review of the facial validity of a statute under the vagueness doctrine described in the preceding paragraph exists where the statute "abut[s] upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1866, 12 L.Ed.2d 377 (1964). In such cases, the considerations underlying vagueness analysis may merge with those that support the first amendment overbreadth doctrine. *See Kolender v. Lawson,* 461 U.S. 352, 359, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983); *Keyishian v. Board of Regents,* 385 U.S. 589, 609, 87 S.Ct. 675, 687, 17 L.Ed.2d 629 (1967). The Supreme Court has consistently adhered to the view that ambiguous laws may cause individuals to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt,* 377 U.S. at 372, 84 S.Ct. at 1323 (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). A law whose broad sweep deters the exercise of protected rights of expression or association is deemed overbroad; if the law's overbreadth is "not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," the law will be struck down in its entirety, even if the conduct of the particular party challenging the statute would be prohibited by an appropriately narrowed law. *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917–18, 37 L.Ed.2d 830 (1973). The overbreadth doctrine permits a facial challenge to a law that "reaches a substantial amount of constitutionally protected conduct," *Boos v. Barry,* — U.S. ——, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333 (1988); *Hoffman Estates,* 455 U.S. at 494, and the Court has employed the same type of analysis under the vagueness doctrine in such cases. *See Kolender v. Lawson,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8. Elsewhere in this opinion, the court rejects plaintiffs' claims under the free exercise and establishment clauses of the first amendment. *See* text, *infra* at 128–35 and 142–45. In any event it is unclear whether the expanded scrutiny of a statute suggested by the majority in *Kolender* applies when facial challenges under the religion clauses are at issue, or is limited to laws which might "chill" rights to expression protected by the first amendment. In light of these considerations, deviation from the standard set out in the text seems inappropriate in the case at bar. This issue is largely academic, however, since under the specific circumstances of this case plaintiffs' "as applied" challenge subsumes all first amendment concerns raised by the alleged vagueness of § 3204.

20. Accordingly, the court will not consider the evidence presented by plaintiffs regarding the manner in which the compulsory education law is applied outside of the Cato–Meridian and Waterloo Districts.

invalid." *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 856 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984).[21] However, they do establish a comparative standard that makes direct reference to the minimum educational standards that must be maintained in the state's public schools. Consequently, plaintiffs' vagueness challenge turns on whether the standards governing public schools in New York are sufficiently comprehensible. As can be gathered from the extensive recitation set out above, the statutory requirements of the compulsory education law have been supplemented by extensive regulations promulgated by the Department of Education, and are further amplified by the detailed curricula requirements of the local school districts. In this important respect, New York's compulsory education scheme is distinguishable from the statutes that were at issue in the cases cited by plaintiffs in support of their vagueness argument.[22] When read in conjunction with the various regulations that compliment § 3204, the court believes that that statute "communicates its reach in words of common understanding." *Boos v. Barry,* 108 S.Ct. at 1169.

Plaintiffs argue that New York's compulsory education scheme gives local school officials too much discretion in establishing what the minimum requirements of public education will be, and in measuring homeschooling programs against those minimum standards. Indeed, it would ap-

pear that expansive local control over the assessment of home instruction programs was intended. By not requiring "equivalency" to a singular statewide standard but instead allowing variations from district to district, § 3204 implicitly entrusts the establishment of educational standards with local school authorities. This policy of allowing local variations in educational standards, however, should not be equated with vagueness; "[t]he difficulty or impossibility of drawing a statutory line [applicable in all districts of the state] is one of the reasons for supplying merely a statutory guideline." *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 399–400, 60 S.Ct. 907, 915, 84 L.Ed. 1263 (1940). In the instant action, the guidelines supplied by the state legislature provide a basic framework within which local authorities can fashion educational standards designed to address peculiar local concerns. The scope, depth, and emphasis of the instruction that is required varies from district to district. However, the policies followed by the three school districts involved in this action in assessing home instruction programs stress cooperation and interaction between homeschooling parents and local school officials. A party's ability to clarify the meaning of a regulation and modify his behavior accordingly, either through the party's own inquiry or through an administrative process, can ameliorate any vagueness problems that might otherwise be created by the terms of that regulation. *Hoff-*

21. *See, e.g., Mazanec v. North Judson–San Pierre School Corp.,* 763 F.2d 845, 848 (7th Cir.1985) ("The term 'equivalent instruction' may be brief, but brief is not vague"); *Braintree Baptist Temple v. Holbrook Public Schools,* 616 F.Supp. 81, 91 (D.Mass.1984) (Requirement that private schools provide "instruction in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town" not deemed impermissibly vague); *Bangor Baptist Church v. Maine,* 549 F.Supp. 1208, 1227 ("equivalent instruction" not overly vague); *State v. Moorhead,* 308 N.W.2d 60 (Iowa 1981) (terms "equivalent instruction" and "certified teacher" not impermissibly vague; court stresses importance of existence of detailed curriculum requirements for public and private schools). *But see State v. Trucke,* 410 N.W.2d 242, 244 (Iowa 1987) (indicating in dicta that

term "equivalent instruction" might be unconstitutionally vague absent state's detailed regulations); *State v. Newstrom,* 371 N.W.2d 525 (Minn.1985) (requirement that private instructor's qualifications be "essentially equivalent" to those of public school teachers deemed too vague in absence of minimal guidelines); *Fellowship Baptist Church v. Benton,* 620 F.Supp. 308, 317–18 (S.D.Iowa 1985), *remanded,* 815 F.2d 485 (8th Cir.1987) ("equivalent instruction" deemed unconstitutionally vague).

22. *See State v. Trucke,* 410 N.W.2d 242, 244 (Iowa 1987) (dicta); *State v. Newstrom,* 371 N.W.2d 525 (Minn.1985); *Fellowship Baptist Church v. Benton,* 620 F.Supp. 308, 317–18 (S.D. Iowa 1985), *remanded,* 815 F.2d 485 (8th Cir. 1987). *See supra* note 21.

*man Estates*, 455 U.S. at 498, 102 S.Ct. at 1193. Plaintiffs are given ample opportunity to discover the specific requisites of the compulsory education law in the districts in which they reside, and thus the court finds that the requirements of § 3204 are not unconstitutionally vague, at least as they are applied to plaintiffs.

### C. *The Free Exercise Clause*

Randy and Alice Blackwelder and George and Hilda Lonneville assert that their religious beliefs compel them to give their children a "Christian education," which they understand to be an education in which their religious values are interwoven into every area of study in which their children engage. They contend that allowing their children to attend public schools, where "religiously integrated" studies are prohibited, would violate fundamental religious tenets. Particularly offensive to them is the study of evolution and what they term an "amoral" approach to sex education in public schools. These plaintiffs maintain that New York's compulsory education laws burden their faith because the state retains the power to approve or disapprove the manner in which they accomplish what they view as a religious command, that is, the manner in which they educate their children.[23]

The first amendment commands that "Congress shall make no law ... prohibiting the free exercise [of religion]," and the fourteenth amendment extends that limitation to the states. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The free exercise clause erects an absolute barrier to governmental encroachment on the freedom of individual belief, *see Bob Jones University v. United States*, 461 U.S. 574, 603, 103 S.Ct. 2017, 2034–35, 76 L.Ed.2d 157 (1983), and extends qualified protection to religiously grounded conduct. *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535–36, 32 L.Ed.2d 15 (1972).[24] The more difficult cases, of course, involve claims that some governmental action impedes conduct tied to an individual's religious beliefs, or compels conduct the individual finds inimical to his religious beliefs. In cases like this one, in which a governmental regulatory system requires some modification of an individual's behavior in contravention of sincerely held religious beliefs, that individual can find refuge in the first amendment if he demonstrates that the governmental action constitutes a "sufficient burden on the free exercise of [his] religious beliefs to require the protections of the free exercise clause." *Smith v. Board of Education*, 844 F.2d 90, 93 (2d Cir.1988). If such a burden is shown, the action will not sustain judicial scrutiny unless the government establishes that "a compelling governmental interest warrants the burden, and that less restrictive means to achieve the government's ends are not available." *St. German of Alaska Eastern Orthodox Catholic Church v. United*

---

**23.** Plaintiffs also argue that the state requires their children to attend public school until their homeschooling program attains approval from the superintendent of schools for the district in which they reside, and that this policy violates the free exercise clause of the first amendment. Though some of the papers submitted to the court in this action have indicated that the state in fact requires such approval before a child can be removed from an "approved" educational setting to an unapproved program, this simply does not appear to be the law in New York. The State Commissioner of Education has found that "there is no statutory requirement that a parent or guardian obtain the consent of a superintendent of schools or board of education before removing a child from a public school." *Matter of Raeder–Tracy*, —— Ed. Dept. Rep. ——, No. 11819, slip op. at 2 (May 14, 1987).

**24.** Chief Justice Warren argued in *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), that "legislative power over mere opinion is forbidden but it may reach people's actions when they are found to be in violation of important social duties or subversive of good order...." *Id.* at 603. The Court has applied an absolutist reading of the free exercise clause in cases challenging laws which compel individuals to "declare a belief," "communicate by word and sign [their] acceptance" of some idea antithetical to their religious beliefs, or make an "affirmation of a belief and an attitude of mind." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 631, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943) (school board rule mandating compulsory flag salute and pledge of allegiance struck down). This case does not involve this type of governmental compulsion.

*States,* 840 F.2d 1087, 1093, (2d Cir.1988); *see also Bob Jones University v. United States,* 461 U.S. at 603, 103 S.Ct. at 2034–35; *United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).[25]

■ Turning to the first part of this test, it must be noted that not all governmental actions that burden religious practices must be justified by a compelling state interest. As Chief Justice Burger has observed, "virtually *every* action that the Government takes, no matter how innocuous it might appear, is potentially susceptible to a Free Exercise objection." *Bowen v. Roy,* 476 U.S. 693, 707 n. 17, 106 S.Ct. 2147, 2156 n. 17, 90 L.Ed.2d 735 (1986) (plurality opinion) (emphasis in original); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n,* — U.S. —, 108

S.Ct. 1319, 1327, 99 L.Ed.2d 534 (1988).[26] As the Supreme Court's definition of "religion" within the meaning of the first amendment has expanded from the narrow theistic perception found in cases like *Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890),[27] to a broader interpretation incorporating the views of unorthodox and nontheistic faiths,[28] a wider range of facially neutral regulations on the conduct of individuals have been subject to challenge under the free exercise clause. *See generally Mozert v. Hawkins County Bd. of Education,* 827 F.2d 1058, 1078–81 (6th Cir.1987) (Boggs, J., concurring), *cert. denied,* — U.S. —, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988). As a consequence, the courts have been forced to distinguish between incidental governmental burdens on religious conduct and those governmental actions that constitute "the type of burden on core religious freedom rising to the level of a violation of the free exercise clause." *Smith v. Board of Education,* 844 F.2d at 94. The Supreme

**25.** This standard has been consistently recounted in recent cases assessing challenges to governmental actions that impact upon religious practices. One prominent exception to this is found in Chief Justice Burger's plurality opinion in *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). There, the Chief Justice suggested that in cases in which a governmental entitlement program conditions the receipt of benefits on some facially neutral and uniformly applicable requirement, that requirement should survive scrutiny under the free exercise clause if the government demonstrates that it is "a reasonable means of promoting a legitimate public interest." 476 U.S. at 707–08, 106 S.Ct. at 21560. This suggestion was sharply criticized by Justice O'Connor in dissent, *see* 476 U.S. at 726–33, 106 S.Ct. at 2165–69, and was expressly rejected by a majority of the Justices in *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 1049–50, 94 L.Ed. 2d 190 (1987).

**26.** The Supreme Court has noted that at least 1,347 religious organizations that are active in the United States have been identified. *See Edwards v. Aguillard,* — U.S. —, —, 107 S.Ct. 2573, 2589, 96 L.Ed.2d 510 (1987) (Powell, J., concurring) (citing The Encyclopedia of American Religions (2d ed. 1987)).

**27.** In that case, Justice Field, writing for the majority, concluded that "[t]he term 'religion' has reference to one's views of his relations to

his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." 133 U.S. at 342, 10 S.Ct. at 300.

**28.** *See, e.g., Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 1683–84, 6 L.Ed.2d 982 (1961) ("Neither [a state nor the federal government] can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs"); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 658, 63 S.Ct. 1178, 1194, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting) ("When dealing with religious scruples we are dealing with an almost numberless variety of doctrines and beliefs entertained with equal sincerity by the particular groups for which they satisfy man's needs in his relation to the mysteries of the universe"); *United States v. Allen,* 760 F.2d 447, 450 (2d Cir.1985) ("[A] touchstone of religion is the believer's categorical 'disregard [of] elementary self-interest ... in preference to transgressing [the religion's] tenets.' " (citations omitted)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 247–49, 92 S.Ct. 1526, 1549–50, 32 L.Ed.2d 15 (Douglas, J., dissenting in part); *United States v. Seeger,* 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965) (interpreting meaning of "religious training and belief" as used in the Selective Service Act, 50 App. U.S.C. § 456(j)).

Court has stressed that "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Yoder*, 406 U.S. at 216, 92 S.Ct. at 1533.

■ In the case at bar, it is not disputed that plaintiffs' beliefs concerning the proper manner in which their children are to be educated are founded upon religious concerns, and thus their attempt to instruct their children at home through a course of study integrating fundamentalist Christian views into all aspects of their children's education is conduct that is at least motivated by their religious beliefs.[29] It is not as clear to the court, however, how the requirements of § 3204 of the Education Law conflicts with those beliefs, or how the manner in which that requirement is enforced by the state's local school districts impinges upon plaintiffs' religious practices. It seems that a certain distrust of public school officials among homeschoolers, including plaintiffs, underlies the objection to this statutory requirement, for apparently there is some fear that those charged with enforcing New York's compulsory education laws will require the teaching of secular matters that are inconsistent with their fundamentalist Christian beliefs. If such a fear crystallized into reality, a serious burden on rights protected by the free exercise clause might be found; but there is nothing in the language of New York's Education Law that mandates such friction, and this case involves, after all, a facial challenge to the compulsory education law. Nonetheless, even assuming that the requirements of New York's compulsory education law do burden practices that are at the core of plaintiffs' religion, the court finds that that burden is justified by compelling state interests, and that § 3204 of the Education Law is as narrowly tailored as is feasible to accommodate the religious conduct at issue in this case without sacrificing those important state interests.

The Supreme Court has consistently held that "only those interests of the highest order" can justify the burdening of an individual's religious practices. *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533. Such compelling state interests are at stake here. The Supreme Court has long recognized that "education is perhaps the most important function of state and local governments." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). It is distinguishable from other governmental entitlement programs because of "[b]oth the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child." *Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2396, 72 L.Ed. 2d 786 (1982). It is important to stress that the two state interests identified in this passage from *Plyler* involve separate and distinguishable considerations. First, there is the significant societal interest in the perpetuation of its political and economic structure. Education has long been deemed vital to the "preservation of a democratic system of government," *Abington School District v. Schempp*, 374 U.S. 203, 230, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), and it is recognized that "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Yoder*, 406 U.S. at 221, 92 S.Ct. at 1536.

---

**29.** The Second Circuit has considered two factors of particular importance in determining whether a particular act is a "religious practice" that must be afforded protection under the free exercise clause: the sincerity of the devotees to the activity at issue, and the centrality of the activity to the devotees' religion. *International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441–43 (2d Cir.1981). There is no reason to doubt the sincerity of plaintiffs in the instant case when they maintain that their desire to educate their children at home is motivated by religious concerns. Though the record before the court does not establish conclusively that homeschooling is central to plaintiffs' religion, plaintiffs have made a sufficient showing to give rise to a serious question of fact on this issue. For the purposes of the motions presently before the court, the centrality of homeschooling to plaintiffs beliefs will be assumed.

Indeed, the Constitution presupposes the existence of an informed citizenry prepared to participate in governmental affairs, and these democratic principles obviously are constitutionally incorporated into the structure of our government. It therefore seems entirely appropriate that the State use "public schools [to] ... inculcat[e] fundamental values necessary to the maintenance of a democratic political system."

*Board of Education v. Pico,* 457 U.S. 853, 876, 102 S.Ct. 2799, 2813, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring) (quoting *Ambach v. Norwick,* 441 U.S. 68, 77, 99 S.Ct. 1589, 1595, 60 L.Ed.2d 49 (1979)). Moreover, "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe,* 457 U.S. at 221, 102 S.Ct. at 2397. Thus, education plays "a fundamental role" in providing the skills necessary for the maintenance of our economic and social order as well as our democratic institutions. *Id.*

These societal goals, however, are not the only matters of concern affected by the educational opportunities provided school-age children. The failure to assure that all children are afforded an education meeting certain minimum standards of adequacy would be attended by serious consequences for the children that are denied such an education. Such a deprivation takes an "inestimatable toll ... on the social, economic, intellectual, and psychological well-being of the individual...." *Id.* at 222, 102 S.Ct. at 2397. Education "is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Board of Education,* 347 U.S. at 493, 74 S.Ct. at 691. When a child lacking the maturity and experience to make an independent judgment concerning the course of his educational future is denied the paramount privilege of an education which meets basic minimum standards, a compelling state interest is implicated. The state, as well as the affected individual, has an interest in assuring that that individual's education provides him a fair

opportunity to become a "self-reliant and self-sufficient participant[ ] in society." *Yoder,* 406 U.S. at 221, 92 S.Ct. at 1536.

When courts attempt to give force to the mandates of the free exercise clause in contexts in which regulations controlling the content and duration of the basic education of children are directly at issue, therefore, two distinct conflicts arise. The state's fundamental interest in assuring that its citizenry is prepared to participate in this nation's political and economic systems may collide with "the values of parental direction of the religious upbringing and education of their children in their early and formative years...." *Yoder,* 406 U.S. at 213–14, 92 S.Ct. at 1532; *see also Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Moreover, there often exists an inherent tension between the desire of parents to prevent the exposure of their minor children to "attitudes, goals, and values contrary to [the parents' religious] beliefs," *Yoder,* 406 U.S. at 218, 92 S.Ct. at 1534, and the interest of those children in having access to ideas that might conflict with their parents' notions of religious propriety so that those children are better able to make informed choices later in life. *See id.* at 241–46, 92 S.Ct. at 1546–48 (Douglas, J., dissenting in part). Within the framework of accepted free exercise analysis, the interest of minors in being exposed to a sufficiently wide range of ideas has been translated into a state interest in preparing individuals to be "self-reliant and self-sufficient participants" in American society. *Id.* at 221, 92 S.Ct. at 1536. As expressed by Justice White, "[a] State has a legitimate interest not only in seeking to develop the latent talents of its children but also in seeking to prepare them for the life style that they may later choose, or at least to provide them with an option other than the life they have led in the past." *Id.* at 240, 92 S.Ct. at 1545 (White, J. concurring); *see also Plyler v. Doe,* 457 U.S. 202, 222, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982); *Brown v. Board of Education,* 347 U.S. 483, 493

(1954) ("In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.").

These dual tensions were present in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526 the case relied upon by plaintiffs in support of their free exercise claims in the present action. In *Yoder*, members of the Old Order Amish religion and the Conservative Amish Mennonite Church (together referred to as the Amish) challenged a Wisconsin compulsory education statute which imposed criminal sanctions upon parents who did not cause their children to attend public or private school until age sixteen. The plaintiffs in that case withdrew their children, ages fourteen and fifteen, from the state's public schools after they had completed the eighth grade, wishing to informally train them in the manual skills necessary for rural community life. Amish resistance to formal education beyond grade eight was rooted in concepts central to their religious beliefs.

> [The Amish] object to the high school, and higher education generally, because the values they teach are in marked variance with Amish values and the Amish way of life; they view secondary school education as an impermissible exposure of their children to a "worldly" influence in conflict with their beliefs. The high school tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students. Amish society emphasizes informal learning-through-doing; a life of "goodness," rather than a life of intellect; wisdom, rather than technical knowledge; community welfare, rather than competition; and separation from, rather than integration with, contemporary worldly society.

*Id.* at 210–11, 92 S.Ct. at 1531. The traditional Amish way of life, stressing a church-oriented community closely tied to "nature and the soil" and rejecting "the outside world and 'worldly influences,'" was found to be mandated by deep religious conviction. *Id.* at 216–17, 92 S.Ct. at 1534. The Court concluded that the values promoted in Wisconsin's secondary school system were "in sharp conflict" with the mode of life mandated by the Amish religion, *id.* at 217, 92 S.Ct. at 1534, and held that Wisconsin's compulsory school attendance statute placed an impermissible burden on the free exercise rights of the Amish. *Id.* at 228–29, 92 S.Ct. at 1540.

Much in Chief Justice Burger's majority opinion in *Yoder* supports plaintiffs' position in the instant action. For example, *Yoder*, especially when read in conjunction with *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), offers strong support for plaintiffs' contention that they have a right protected by the Constitution to teach their children at home, however qualified that right may be.[30] Further, it seems clear that Amish

---

**30.** This proposition, however, is not completely without doubt, since there is some authority to the contrary in *Board of Education v. Allen*, 392 U.S. 236, 246–47, 88 S.Ct. 1923, 1928, 20 L.Ed.2d 1060 (1968). In *Pierce*, the Supreme Court resorted to the due process clause in striking down a statute requiring children between ages eight and sixteen to attend public school, finding that the statute unreasonably interfered with the interest of parents to "direct the upbringing and education of children under their control." 268 U.S. at 534–35, 45 S.Ct. at 573. In doing so, the Court specifically recognized that a state retained the power to promulgate reasonable regulations for all schools, whether public or private. *Id.* at 534, 45 S.Ct. at 573. In *Allen*, the Court observed in dictum that certain cited state court decisions that had refused to permit parents to satisfy compulsory education statutes through home instruction "were a sensible corollary of *Pierce v. Society of Sisters*," since the state's interest in assuring that private schools fulfill basic educational functions could justify such a limitation. 392 U.S. at 246–47, 88 S.Ct. at 1928. Just four years later, however, the Court found that Amish parents had a right protected by the free exercise clause to instruct their children at home rather than being compelled to cause their children to attend a recognized public or private school. *Yoder*, 406 U.S. at 228–29, 92 S.Ct. at 1539–40. This holding seems to undermine the *Allen* dictum, though it is possible to restrict the *Yoder* holding to the unique circumstances that case presented. *See* text, *infra* at 134–35. The Fourth Circuit, for example, did not find that *Yoder* supported an inference that a "right" to teach your children at home was protected by the free exercise clause. *Duro v. District Attorney*, 712 F.2d 96, 99 (4th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct.

children learning manual skills through trial and error methods are not receiving an education that is "substantially equivalent" to that being offered ninth and tenth grade pupils in Wisconsin's public schools, no matter how loosely the term "substantially equivalent" is defined. Therefore, it is possible that the requirements of § 3204 may not be compatible with the free exercise clause in at least some circumstances, however unique those circumstances may be.

Finally, the majority opinion in *Yoder* seems to strengthen the position of the parents in the case at bar by minimizing the interest of minors in being exposed to ideas contrary to the religious dogmas of their parents.[31] The Court was unwilling to allow the Amish children to assert such an interest on their own behalf in a challenge to a statute that subjected their parents to possible criminal sanctions. 406 U.S. at 230–31, 92 S.Ct. at 1541. Further, the Court was reluctant to construe the power of the state as *parens patriae* so broadly as to allow it, in the interest of the child, to mandate that the child receive the benefits of secondary education regardless of the wishes of the child's parents. *Id.* at 229, 92 S.Ct. at 1540. The Court was concerned about the pressures of "contempo-

rary society [that] exert[ed] a hydraulic insistence on conformity to majoritarian standards," *id.* at 217, 92 S.Ct. at 1534, fearing any suggestion that the state had the power " 'to standardize its children.' " *Id.* at 233, 92 S.Ct. at 1542 (quoting *Pierce,* 268 U.S. at 535, 45 S.Ct. at 573).

> We must not forget that in the Middle Ages important values of the civilization of the Western World were preserved by members of religious orders who isolated themselves from all worldly influences against great obstacles. There can be no assumption that today's majority is "right" and the Amish and others like them are "wrong." A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different.

406 U.S. at 223–24, 92 S.Ct. at 1537. The Chief Justice found that only when "harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred" can the state freely regulate religious practices of a child's parents in order to protect what the state believes to be the best interest of the child affected by the practices. *Id.* at 230, 92 S.Ct. at

998, 79 L.Ed.2d 230 (1984). In any event, even *Yoder* recognized the state's power to promulgate reasonable minimum standards for the instruction provided by the Amish, *id.* 406 U.S. at 236, 92 S.Ct. at 1543, though the Court did not attempt to define the extent of this power. Since New York allows homeschooling, at issue in the instant case is the extent that the state can regulate the instruction given in such a program.

31. In *Yoder,* the children who were taken out of the public school system by their parents were not parties to the lawsuit that ensued. The majority stressed this, and also noted that it was the parents and not the children who were threatened with prosecution under Wisconsin's compulsory attendance law, thus concluding that it was the parents' right of free exercise of religion that was truly at issue in that case. 406 U.S. at 230–31. In dissent, Justice Douglas argued that "no analysis of religious-liberty claims can take place in a vacuum," and that the rights of the children affected could not be effectively vindicated in any other forum.

> If the parents in this case are allowed a religious exemption, the inevitable effect is to impose the parents' notions of religious duty upon their children. Where the child is mature enough to express potentially conflicting desires, it would be an invasion of the child's rights to permit such an imposition without canvassing his views.

*Id.* at 242, 92 S.Ct. at 1546 (Douglas, J., dissenting in part). Even Justice Douglas did not address whether or how the interests of children who had not yet achieved the maturity "to express potentially conflicting desires" should be accommodated when their parents wished to prevent their exposure to ideas deemed threatening to parental religious beliefs.

In this case, the children involved are named parties, but they have not expressed desires contrary to those of their parents. Consequently, the court cannot find that this case is distinguishable from *Yoder* merely because the Amish children were not named parties in *Yoder.* Nonetheless, as is discussed in the text, *infra* at 134–35, the court simply cannot agree that the interests of the children, as expressed as an interest of the state in assuring that its youth is equipped with all the skills required to live in modern society, can be ignored in any proper balancing of conflicting interests when the free exercise rights of homeschooling parents are implicated.

1540–41. The majority noted that the Amish system of "learning-by-doing" had a successful track record in preparing Amish children for life as adults in the separated agrarian community the Amish maintained, *id.* at 222–23, 92 S.Ct. at 1536–37, and that the Amish did not object to the attendance of their children in public schools through the first eight grades, since they believed that it was necessary for their children to acquire a basic education in order "to function effectively in their day-to-day life under self-imposed limitations on relations with the world." *Id.* at 225, 92 S.Ct. at 1538. Consequently, the Court concluded that there was no evidence that Amish beliefs concerning the education of their children threatened those children with physical or mental harm or posed a danger to the public welfare. *Id.* at 230, 92 S.Ct. at 1540. Having discounted the state's interest in assuring that the Amish children were exposed to the "worldly" ideas and influences their parents rejected, the majority found that the remaining state interest in assuring that its citizens were prepared to effectively and intelligently discharge their responsibilities as citizens in a democratic society would not be substantially furthered by requiring Amish children to attend one to two more years of school beyond the eighth grade. *Id.* at 234, 92 S.Ct. at 1542.

The concerns eloquently summarized by Chief Justice Burger are not inconsequential. Any regulation of the manner in which parents rear their children—and just such a regulation is at issue in this case— raises serious concerns about the power of the state to intrude upon even the most intimate aspects of family life. The family, as an institution, has historically served as "a latent counterweight to central authority." L. Tribe, *American Constitutional Law* § 14–13 at 883 (1978). It is with trepidation that a court interferes with "the traditional interest of parents with respect to the religious upbringing of their children," *Yoder*, 406 U.S. at 214, 92 S.Ct. at 1532, particularly when the religious beliefs of the parents are unfashionable or out of step with the prevailing views of the majority. Nonetheless, the court concludes

that the state's interest in the intellectual, social, and psychological well-being of the children involved in this action cannot be minimized, as it was in *Yoder*.

In *Yoder*, the Supreme Court emphasized that the Amish children were to be provided training designed to prepare them for life in an agrarian community separated from the outside world. In contrast, the children in the present case will be required to live and work in modern society upon reaching the age of maturity, and consequently their "educational needs are plainly not as circumscribed as those of Amish children." *Johnson v. Charles City Community Schools Board of Education*, 368 N.W.2d 74, 84 (Iowa 1985); *see also Mozert v. Hawkins County Board of Education*, 827 F.2d at 1067; *Duro v. District Attorney*, 712 F.2d 96, 98 (4th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 998 (1984). The state's interest in the social and intellectual development of children residing within its borders is therefore greater under the circumstances of the present case than it was in *Yoder*, where the Amish children did attend public schools for a substantial period and were not likely to engage in extensive interaction with the mainstream of American society.

Even the cases most favorable to plaintiffs emphasize the power of states under ordinary circumstances to take whatever actions are necessary to ensure that the education afforded to its children meets certain minimal standards. The language of *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, provides the greatest support for "the liberty of parents and guardians to direct the upbringing and education of children under their control," *id.* at 534–35, 45 S.Ct. at 573, but even this case stressed that

> [n]o question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be

taught, and that nothing be taught which is manifestly inimical to the public welfare.

*Id.* at 534, 45 S.Ct. at 573. The Supreme Court has repeatedly indicated that a state may impose "secular educational requirements" upon religious schools, *see Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), and "confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction." *Board of Education v. Allen,* 392 U.S. 236, 245–46, 88 S.Ct. 1923, (1968) (citing with seeming approval N.Y.Educ.Law § 3204(2)); *see also Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Even in *Yoder* the majority cautioned that its holding did not "undermine the general applicability" of compulsory education statutes. 406 U.S. at 236, 92 S.Ct. at 1543. As Justice White pointed out in a separate concurrence, the Court's precedents "lend[ ] no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Id.* at 239, 92 S.Ct. at 1245 (White, J. concurring).

■ In sum, the holding in *Yoder* must be limited to its unique facts and does not control the outcome of plaintiffs' free exercise challenge in this case. Unless a child is a member of an identifiable religious sect with a long history of maintaining a successful community separate and apart from American society in general, it must be assumed that that child must be intellectually, socially, and psychologically prepared to interact with others who may not share the views of the parents in the case at bar. A state's interest in establishing standards for the education of its young in order to prepare them for participation in American political and economic processes as well as to "nurture and develop [their] human potential," *id.,* overrides the interest of parents to teach their children in a religious

school or at home free from governmental interference.

Moreover, New York's compulsory education scheme would seem to be the least restrictive means to serve that overriding governmental interest. The "substantially equivalent" standard is flexible enough to allow local school officials sufficient leeway to accommodate the special requirements of diverse religious groups without sacrificing the vital state interests at issue. There may be cases in which the manner the state enforces the mandate of § 3204 unnecessarily infringes the free exercise rights of particular parents, but the mere possibility that such cases might arise is not enough to invalidate § 3204 on its face. Promulgation of more specific requirements for homeschooling programs that would satisfy plaintiffs might offend the religious tenets of others without necessarily affording any greater deference to plaintiffs' religious principles than is currently provided under a scheme that contemplates cooperation between school officials and those parents who wish to educate their children at home.

In light of the foregoing, the court rejects plaintiffs' free exercise challenge to New York's compulsory education law and the means through which it is enforced, and defendants' motion for summary judgment on the free exercise claims of the Blackwelders and Lonnevilles is granted.

### D. *The Substantive Due Process Privacy Rights of Parents*

■ The Supreme Court has long recognized that "freedom of personal choice in matters of family life is a fundamental liberty interest" protected by the due process clause of the fourteenth amendment. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Smith v. Organization of Foster Families,* 431 U.S. 816, 842–45, 97 S.Ct. 2094, 2108–10, 53 L.Ed.2d 14 (1977); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed. 2d 52 (1974); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 796, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268

U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The constitutional protection extended this liberty interest is not limited to guarantees concerning the minimum procedural safeguards deemed necessary to reduce the possibility of its erroneous deprivation;[32] instead, the qualified freedom of autonomy in decisions affecting one's family is afforded substantive protections by the due process clause, and as a consequence, any state interference with this liberty interest must further some legitimate, if not compelling, state interest. *See Smith,* 431 U.S. at 842–47 & n. 46, 97 S.Ct. at 2108–11 & n. 46 (collecting cases). Plaintiffs argue that they have a constitutionally protected privacy right to educate their children at home, and that the requirements of New York's compulsory education law impermissibly burdens that right.

■ In the 1920s, the Court recognized that parents and guardians possessed a substantive due process right "to direct the upbringing and education of children under their control." *Pierce v. Society of Sisters,* 268 U.S. at 534–35, 45 S.Ct. at 573; *Meyer v. Nebraska,* 262 U.S. at 399–400, 43 S.Ct. at 626–27. Though much of the "substantive due process" doctrine that flourished in that era has subsequently been repudiated by *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), and its progeny, the Court has continued to give force to the principles expressed in *Pierce* and *Meyer.* In more recent cases,

however, parental control over child-rearing and education has been conceptualized as an aspect of the right to privacy secured by the ninth amendment and the due process clause of the fourteenth amendment. *See, e.g., Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 2843, 92 L.Ed.2d 140 (1986); *Carey v. Populations Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65–66, 93 S.Ct. 2628, 2639–40, 37 L.Ed.2d 446 (1973). The Constitution recognizes a privacy interest which attaches to certain decisions concerning intimate personal relationships,[33] and governmental interference with that interest must be justified by an appropriate governmental interest, and must be no greater than is reasonably necessary to serve that interest.

The degree of judicial scrutiny to be applied to a governmental action that interferes with the privacy interests recognized in *Pierce* and *Meyer,* however, is not clear to this court. In *Meyer,* the Court indicated that a parent's right to "establish a home and bring up children [and] to worship God according to the dictates of his own conscience" may not be interfered with by state action "which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." 262 U.S. at 399–400, 43 S.Ct. at 627. This standard was repeated in *Pierce v. Society Sisters* with reference to the parental right "to direct the upbringing and education of children under their control." 268 U.S. at 534–35, 45 S.Ct. at 573.

---

**32.** The extent of the procedural protection offered by the due process clause to this liberty interest is the subject of *Santosky,* 455 U.S. at 758–70, 102 S.Ct. at 1397–1404; *Lassiter v. Department of Social Services,* 452 U.S. 18, 27–33, 101 S.Ct. 2153, 2159–63, 68 L.Ed.2d 640 (1981); *Smith,* 431 U.S. at 847–56; and *Stanley v. Illinois,* 405 U.S. 645, 650–58, 92 S.Ct. 1208, 1212–16, 31 L.Ed.2d 551 (1972).

**33.** More accurately, it appears that there are two distinct lines of precedent giving force to different but related aspects of the Constitution's "promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government." *Thornburgh v. American Coll. of Obst. & Gyn.,* 476 U.S. 747, 772, 106 S.Ct. 2169, 2184, 90 L.Ed.2d 779 (1986)

(citing *Pierce* and *Meyer* ). First, the Court "has recognized a privacy interest with reference to certain *decisions* that are properly for the individual to make," *Bowers v. Hardwick,* 106 S.Ct. at 2850 (Blackmun, J., dissenting) (emphasis in original), and second, the Court "has recognized a privacy interest with reference to certain *places* without regard for the particular activities in which the individuals who occupy them are engaged." *Id.* at 2850–51 (emphasis in original). The latter privacy interest implicates constitutional concerns rooted in the fourth amendment. Plaintiffs' fourth amendment claims are discussed in the text, *infra,* at 137–42. The court's focus in this portion of its opinion is on the decisional aspect of plaintiffs' privacy rights.

It is doubtful, however, that the Court's understanding of rationality analysis in the mid–1920s was as limited as it is under modern substantive due process analysis. *But see Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542. Further, more recent privacy cases involving the constitutional right to privacy indicate that state regulations burdening such a right "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey v. Population Services,* 431 U.S. at 686, 97 S.Ct. at 2016 (striking down regulation prohibiting distribution of contraceptives to minors); *see also Roe v. Wade,* 410 U.S. 113, 153–56, 93 S.Ct. 705, 726–28, 35 L.Ed.2d 147 (1973) (woman's right to abortion).[34]

 Nonetheless, whatever the standard of review that is to be applied, it is clear that in the instant case New York's compulsory education statute survives scrutiny. In *Yoder,* the Court indicated that a stronger state purpose and a closer congruence between that interest and the means chosen to accomplish that purpose would be required "when the interests of parenthood are combined with a free exercise claim." 406 U.S. at 233, 92 S.Ct. at 1542. The rationale underlying the court's determination that New York's compulsory education scheme in general, and § 3204 in particular, is the least restrictive means possible to serve compelling state interests in a manner that does not unnecessarily impinge upon plaintiffs' free exercise rights, *see* text, *supra* at 134–35, is equally germane to plaintiffs' substantive due process claims. Accordingly, defendants' motion for summary judgment on those claims is granted.

### E. *The Fourth Amendment Claims*

Plaintiffs' contention that New York's compulsory education scheme as enforced by the defendant superintendents violates their constitutionally protected privacy rights has another, distinctive dimension. The school districts that are involved in this lawsuit adhere to a policy of making final approval of a homeschooling program contingent upon the results of one or two scheduled on-site visits made while home instruction is in progress by representatives of the school districts or by mutually acceptable third parties. There is no specific provision in the Education Law that requires such on-site visits, nor is there a specified procedure through which a superintendent can obtain an administrative warrant to conduct such a visit on the premises of homeschooling parents who refuse to consent to such inspections. Plaintiffs maintain that the on-site inspection policies followed by the defendant superintendents violate rights protected by the fourth and fourteenth amendments.

The fourth amendment provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The fourth amendment's prohibitions have been made applicable to the states through the due process clause of the fourteenth amendment. *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949).

Defendants argue that the home visits contemplated by the superintendents do not constitute "searches" within the meaning of the fourth amendment, and find support for this position in *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). In *Wyman,* the Court held that home visitations by case workers employed by New York's Department of Social Services were not "searches" subject to the constraints of the fourth amendment because the purpose of those visits were "rehabilitative" rather than part of a criminal investigation, and because withholding con-

---

**34.** Some courts have upheld the compulsory education requirements of other states by applying rationality analysis, *see, e.g., State v. Shaver,* 294 N.W.2d 883, 899 (N.D.1980), while others have upheld such requirements after subjecting the state law in question to heightened scrutiny. *In re Charles,* 399 Mass. 324, 504 N.E.2d 592, 598–600 & n. 8 (1987).

sent to such visitations did not result in criminal penalties but instead only caused the loss of benefits under New York's Aid to Families with Dependent Children ("AFDC") program. *Id.* at 317–18, 91 S.Ct. at 386. Though defendants accurately observe that the sort of home visits contemplated by the school superintendents in the case at bar are similar in a number of relevant respects to the visitations at issue in *Wyman*,[35] the court declines to follow *Wyman*'s narrow conception of the scope of the fourth amendment, largely because it is inconsistent with the weight of Supreme Court precedent.

■ As defined in *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Id.* at 113, 104 S.Ct. at 1656; *see also Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985); *United States v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 3301–02, 82 L.Ed.2d 530 (1984); *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *Smith v. Maryland*, 442 U.S. 735, 739–41, 99 S.Ct. 2577, 2579–81, 61 L.Ed.2d 220 (1979); *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). The on-site visits contemplated by the defendant superintendents are to take place in the plaintiffs' homes. An individual's home "traditionally has been regarded as the center of [that] person's private life, the bastion in which one has a legitimate expectation of privacy protected by the Fourth Amendment." *Griffin v. Wisconsin*, 107 S.Ct. 3164, 3173 (Blackmun, J., dissenting) (citing *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682–83, 5 L.Ed.2d 734 (1961)); *see also Poe v. Ullman*, 367 U.S. 497, 550–51, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989 (1961) (Harlan, J. dissenting). By utilizing their homes as schools, plaintiffs do not forfeit all reasonable expectations of privacy in them. If

commercial premises are afforded protection under the fourth amendment, *see Marshall v. Barlow's Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978), and *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), it cannot fairly be said that homes in which children are educated should not be. That the on-site visits are not conducted as part of a criminal investigation is wholly irrelevant; "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court*, 387 U.S. 523, 530, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967) (footnote omitted).

■ Since the fourth amendment imposes limitations on the manner in which on-site visits can be conducted by school officials, the court must determine whether the policy of the defendant superintendents to condition approval of homeschooling programs on such visits renders the on-site visits "unreasonable searches" within the meaning of the fourth amendment when there is no procedure through which a warrant authorizing such visits can be obtained from a neutral judicial officer. In determining whether a governmental invasion of a protected fourth amendment privacy interest is "unreasonable," the court must "balanc[e] the need to search against the invasion which the search entails." *Id.* at 537, 87 S.Ct. at 1735; *see also Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879. In striking this balance, the Supreme Court has "consistently followed" one fundamental principle: "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara*, 387 U.S. at 528–29, 87 S.Ct. at 1731; *see also Marshall v. Barlow's, Inc.*, 436 U.S. at 312, 98 S.Ct. at 1820. Warrants are favored because they interpose "the detached scruti-

---

**35.** Defendants note that the on-site visit policies adopted by the school superintendents who are parties to this action are unrelated to criminal investigations. Instead, the sole purpose of such visits is the evaluation of the quality of instruction offered at the home. Further, the refusal to allow such visits to take place does not result in criminal charges, and if consent to the visits is not obtained, no on-site visit occurs.

ny of a neutral magistrate" between the individual and the state actor, whose judgment may be skewed by their institutional concerns. *See United States v. Leon,* 468 U.S. 897, 913–14, 104 S.Ct. 3405, 3415–16, 82 L.Ed.2d 677 (1984); *Marshall v. Barlow's, Inc.,* 436 U.S. at 312, 98 S.Ct. at 1820; *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977).

■ In those classes of cases in which the Supreme Court has held that an invasion of fourth amendment privacy interests may be deemed "reasonable" without the benefit of a warrant, the public interest in permitting warrantless searches has been found to outweigh the individual privacy interest implicated by such searches. *See, e.g., Camara,* 387 U.S. at 583, 87 S.Ct. at 1737; *United States v. United States District Court,* 407 U.S. 297, 315, 92 S.Ct. 2125, 2135–2136, 32 L.Ed.2d 752 (1972). Three established exceptions to the warrant requirement are arguably applicable to the case at bar. In one line of cases, the Supreme Court has dispensed with the warrant requirement when "closely regulated industries" subject to detailed regulatory schemes providing for warrantless inspections are involved. *See, e.g., New York v. Burger,* —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (vehicle-dismantling industry); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (coal mining); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor industry). This so-called "regulatory search" exception to the warrant requirement is predicated on the reduced expectation of privacy those engaged in such industries have in their commercial premises, and a correspondingly heightened governmental interest in regulating such industries. *Burger,* 107 S.Ct. at 2643. A warrantless inspection of a highly regulated industry will not be deemed reasonable within the meaning of the fourth amendment, however, unless at least three criteria are met. First, a "substantial" government interest must underlie the regulatory scheme at issue; second,

warrantless inspections must be necessary for the advancement of the regulatory scheme; and third, the regulatory scheme must "provid[e] a constitutionally adequate substitute for a warrant," *Donovan v. Dewey,* 452 U.S. at 603, 101 S.Ct. at 2540, by "advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and ... [by] limit[ing] the discretion of the inspecting officers." *Burger,* 107 S.Ct. at 2644.

Even if the court were to assume that by maintaining a homeschooling program plaintiffs converted their homes into "commercial premises" subject to the warrant exception for highly regulated industries, the on-site visits in question in this case do not arise out of the sort of pervasive regulatory scheme contemplated by this limited exception to the warrant requirement. Though the governmental interest in assuring that its children receive an adequate education is paramount, *see* text, *supra* at 130–31, the court cannot agree that warrantless inspections of plaintiffs' schools are necessary to serve this interest. First, warrantless on-site inspections are not necessary to effectively assess homeschooling programs, since it is likely that a warrant authorizing such a visit could be obtained on a showing akin to the diluted "probable cause" standard used to obtain a warrant to conduct health and safety inspections of residential and commercial buildings. *See, e.g., Camara,* 387 U.S. at 538–39, 87 S.Ct. at 1736. Second, defendants have failed to demonstrate that the superintendents' policy requiring on-site visits is executed pursuant to a clear statutory or regulatory system that, "in terms of the certainty and regularity of its application," serves to advise plaintiffs that the visits are being made pursuant to law, nor that the discretion of the school officials conducting the visits is properly limited. Consequently, the "regulatory search" exception to the fourth amendment's warrant requirement is inapplicable in this case.

The second recognized exception to the warrant requirement relevant to the case at bar is based on an alternative holding

supporting the Supreme Court's decision in *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381. After holding that home visitations by social services case workers were not "searches," the Court went on to hold that even if the visits were considered searches, they were not unreasonable under the fourth amendment, even though they were conducted without first obtaining a warrant. *Id.* at 318–24, 91 S.Ct. at 386–89. The Court found the warrantless home visits, which were not compelled by the threat of criminal sanctions for the refusal to allow them, were reasonable because of the importance of the "public interest" in the welfare of children, *id.* at 318, 91 S.Ct. at 386, the visits were necessary for the determination of AFDC benefits, *id.* at 322, 91 S.Ct. at 388, the visits were not made by law enforcement officers for the purpose of conducting criminal investigations, *id.* at 322–23, 91 S.Ct. at 388, and the visits were made only upon advance written notice to the family to be visited, with forcible entries never being made. *Id.* at 320–21, 91 S.Ct. at 387. The Court concluded that under the circumstances a warrant procedure would be more intrusive on the fourth amendment privacy rights of the individuals subjected to such visits than the existing procedures. The Court reasoned that a warrant "presumably could be applied for *ex parte*, its execution would require no notice, it would justify entry by force, and its hours for execution would not be so limited as those prescribed for home visitations." *Id.* at 323–24, 91 S.Ct. at 389.

Defendants correctly point out that the sort of visits contemplated in the case at bar are analogous to those at issue in *Wyman:* the state's interest in the welfare of its children is implicated, the visits are probably necessary to a fair assessment of whether a home instruction program is "substantially equivalent" to the instruction offered in the local public schools, *see In re Adam P.*, 132 Misc.2d at 802, 505 N.Y.S.2d at 813, the visits are made by school representatives rather than law enforcement officers, the home visits are made on notice to the families involved and are limited to the actual site of instruction, and forcible entries are never attempted.

Nonetheless, the Court's decision in *Wyman* on the issue of the reasonableness of home visits by social services case workers seems inconsistent with prevailing fourth amendment analysis, and the precedential effect of *Wyman* probably should be limited to the specific facts of that case. *See, e.g., Zweibon v. Mitchell*, 516 F.2d 594, 632 n. 94 (D.C.Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976).

First, *Wyman*'s emphasis on the importance of the state interest at issue seems incomplete; the Court's focus generally has centered upon whether the governmental interest would be *frustrated* by the warrant requirement. *See, e.g., Donovan v. Dewey*, 452 U.S. at 603, 101 S.Ct. 2534; *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). Defendants do not indicate that frequent unannounced inspections of plaintiffs' home schools which are not delayed by the need to obtain a warrant are necessary to serve the governmental interests at stake. Presumably a warrant could be obtained on a showing of "probable cause" derived from the standard used in typical administrative searches that are not conducted in furtherance of a criminal investigation. In *Camara*, the Court indicated that warrants could be obtained for health and safety inspections of residential dwellings "if reasonable legislative or administrative standards for conducting an area inspection are satisfied," and that such standards may be based upon the mere passage of time as well as specific knowledge of the condition of the dwelling to be inspected. 387 U.S. at 538, 87 S.Ct. at 1736. A similar approach could be adopted with regard to on-site visits by school authorities. Further, the court cannot endorse the notion that the conditions of on-site visits as established by neutral magistrates would necessarily be more intrusive than those that would be set by school officials, particularly if those school officials were not required to justify their desire to inspect a homeschooling program to a detached judicial officer. As Professor LaFave has noted, "there is no necessity for the warrant application process to be *ex parte* or for

the warrant to be executed without any advance notice. Nor, as is made clear by *Camara,* is it true that these special warrants must be subject to execution by force." 3 W. LaFave, *Search and Seizure* § 10.3(a) at 675 (2d ed. 1987). In sum, the court concludes that the *Wyman* exception to the warrant requirement should not be extended to the on-site inspections that the defendant superintendents wish to conduct.

 The third recognized exception to the warrant requirement relevant to the defendant school superintendents' policies concerning on-site visits is the exception that has been carved out for searches conducted with the consent of the party whose privacy interest is implicated. Defendants point out that they have never conducted forcible inspections of the premises of homeschoolers who have refused to allow such visits.[36] Plaintiffs assert, however, that by refusing to approve homeschooling programs without first conducting an on-site inspection, the superintendents are using the powers vested in them by the Education Law to coerce the waiver of the plaintiffs' fourth amendment rights. Cf. *Wyman v. James,* 400 U.S. at 328–331, 91 S.Ct. at 391–93 (Douglas, J., dissenting) (arguing that denial of AFDC benefits for failure to allow warrantless home visits rendered any "consent" to such a visit a nullity). The court does not agree.

Plaintiffs maintain that the threat of educational neglect proceedings deprive those parents of the opportunity to make a truly voluntary consent to such a search.[37] Though plaintiffs may have a right protected by the Constitution to teach their children at home, *but see supra* note 30, that right is not unqualified. The Supreme Court has indicated that it would be permissible for a state to condition such a "right" on the ability of its officials to conduct "reasonabl[e]" inspections. *Pierce v. Society of Sisters,* 268 U.S. at 534, 45 S.Ct. at 573. The New York courts have found that the infrequent on-site visits contemplated by defendants are reasonable, *see, e.g., In re Kilroy,* 121 Misc.2d 98, 467 N.Y.S.2d 318, 321 (Fam.Ct.1983), and this court agrees. The on-site visits are infrequent, are limited to the area in the home in which instruction is given, and are conducted only at a mutually agreed upon time. More importantly, the refusal of the defendant superintendents to approve of a homeschooling program without first conducting on-site visits does not necessarily mean that a finding of educational neglect is unavoidable. Under the compulsory education law, parents have the burden of demonstrating that their children are receiving an education "substantially equivalent" to that offered in public schools. Obtaining the approval of a homeschooling program by a local school superintendent is one way to discharge that burden, but it is not necessarily the only way. The parents still have the opportunity to try to convince a Family Court judge that their children are receiving an education meeting minimum state standards in an educational neglect proceeding. Thus, by refusing to consent to on-site visits, these parents do not necessarily forfeit their "right" to teach their children at home. Consequently, this case is distinguishable from the

36. Indeed, it is argued that since plaintiffs have refused to permit on-site visits and defendants have not forcibly conducted such visits against plaintiffs' wishes, plaintiffs lack standing to pursue their fourth amendment claims. However, plaintiffs' refusal to permit such visits forecloses approval of their home instruction programs by the defendant superintendents, which in turn could result in the institution of educational neglect proceedings. This would seem to be a harm sufficient to satisfy Article III's standing requirements. *See supra* note 12.

37. Plaintiffs rely on *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943, where the Court found that the owner of a business could not be criminally prosecuted for refusing to permit a warrantless inspection of the premises of his business by representatives of Seattle's Fire Department, *id.* at 546, 87 S.Ct. at 1741, and *Camara,* where the Court held that an individual could not be prosecuted for refusing to permit health inspectors to enter his residence without a warrant, 387 U.S. at 540, 87 S.Ct. 1736–37 in support of their contention that any "consent" that could be found under the regulatory framework governing the quality of education in the home is "involuntary" as a matter of law. In neither of those cases did the governmental officials attempt to conduct a forcible search against the protests of the owner of the properties in question.

cases upon which plaintiffs rely, *see supra* note 37, since the exercise of some right or privilege is not *conditioned* upon plaintiffs' consent to a warrantless search. Under these circumstances, the court cannot find that the ability of plaintiffs to freely and voluntarily consent to on-site inspections has been impaired.

Because defendants do not attempt on-site visits without the permission of the families involved, and because it cannot be fairly said that some right or privilege is conditioned upon consent to such visits, the court finds that defendants are entitled to summary judgment on plaintiffs' fourth amendment claims.

### F. *The Establishment Clause*

■ Plaintiffs argue that § 3204 of the Education Law violates the establishment clause of the first amendment in at least two respects. First, plaintiffs assert in their amended complaint that the statute "requires the imprimatur of the government to be placed upon religious education as a condition to the practice of religious education." Amended Complaint ¶ 6.6; *see also id.* ¶ 6.11. Second, plaintiffs maintain that the home visits demanded by the defendant superintendents constitute an excessive intrusion by public school officials into the operation of religious schools. *Id.* ¶ 6.9.

The first amendment forbids the enactment of any law "respecting an establishment of religion." The Supreme Court has identified the primary evils this clause was designed to prevent as the "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz*

*v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). With this in mind, the Court formulated a three-part test for assessing establishment clause challenges to legislation in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster 'an excessive governmental entanglement with religion.'" *Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted); *see also Edwards v. Aguillard*, — U.S. —, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 55–56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985).[38]

The court finds that the "purpose" prong of the *Lemon* test has been satisfied in this case. The first part of the *Lemon* test "'asks whether government's actual purpose is to endorse or disapprove of religion.'" *Edwards*, 107 S.Ct. at 2578 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). The relevant inquiry is whether the state has "abandon[ed] neutrality and act[ed] with the intent of promoting a particular point of view in religious matters." *Corporation of the Presiding Bishop v. Amos*, — U.S. —, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). While a governmental action motivated in part by some religious purpose may satisfy the "purpose" test if some other secular purpose exists, *Wallace v. Jaffree*, 472 U.S. at 56, 105 S.Ct. at 2489, "it is required that the statement of such purpose be sincere and not a sham." *Edwards*, 107 S.Ct. at

---

**38.** The *Lemon* test has been applied by the Supreme Court in all cases subsequent to its formulation with one exception. In *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed. 2d 1019 (1983), the Court carved out a narrow exception to the prohibitions of the establishment clause to accommodate the practice of giving invocational prayers in legislative chambers, citing the long and unique history of this practice in the United States. Such an approach is inappropriate in the instant case, since the sort of mandatory education laws at issue here were not in existence at the time the Bill of Rights were adopted. *See Wisconsin v. Yoder*, 406 U.S. at 225–28 & n. 14, 92 S.Ct. at 1538–40,

n. 14; cf. *Edwards*, 107 S.Ct. at 2577 n. 4 (free public education virtually non-existent at time Constitution adopted); *Wallace v. Jaffree*, 472 U.S. at 80, 105 S.Ct. at 2502 (O'Connor, J., concurring in judgment) (same). In New York, for example, a public school system was first established in 1812, and it was not until 1874 that the state legislature passed a compulsory education law. The requirement of an education equivalent to that offered in the public schools was first codified in 1894. *See In re Franz*, 55 A.D. 2d 424, 429, 390 N.Y.S.2d 940, 943 (2d Dept. 1977); *In re Falk*, 110 Misc.2d 104, 107, 441 N.Y.S.2d 785, 788 (Fam.Ct.1981).

2579; *see also Wallace v. Jaffree,* 472 U.S. at 64, 105 S.Ct. at 2494 (Powell, J., concurring); *id.* at 75, 105 S.Ct. at 2499–2500 (O'Connor, J., concurring); *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980). As noted in greater detail above, New York's compulsory education law serves the important state interests of preserving our basic political and economic institutions as well as assuring that our children are intellectually and socially prepared to become self-reliant members of society. *See* text, *supra* at 130–32. These are clearly legitimate secular purposes. *See Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111 ("A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate"); *Board of Education v. Allen,* 392 U.S. 236, 245–48, 88 S.Ct. 1923, 1927–29, 20 L.Ed.2d 1060 (1968). Moreover, there is no evidence in the history of New York's compulsory education law that any other nonsecular purpose was meant to be advanced in its original enactment or subsequent evolution. *See, e.g., In re Franz,* 55 A.D.2d 424, 429, 390 N.Y.S.2d 940, 943 (2d Dept. 1977); *In re Falk,* 110 Misc.2d 104, 107, 441 N.Y.S.2d 785, 788 (Fam.Ct.1981).

The second prong of the *Lemon* test mandates that the challenged state action not have the primary effect of advancing or inhibiting religion. 403 U.S. at 612, 91 S.Ct. at 2111. As Justice O'Connor put it, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). Plaintiffs allege in their amended complaint that § 3204 of the Education Law effectively conditions the "the practice of religious education" on the approval of state actors, thereby inhibiting plaintiffs' religion. By requiring that the schools attended by the plaintiff children in this case satisfy certain basic non-denominational educational standards, however, New York does not treat them any differently than it does other private schools in the state. Rather than "communicating a message of government ... disapproval" of plaintiffs' religion, the state has at-

tempted to accommodate plaintiffs' religious beliefs while at the same time assuring that educational standards are maintained in plaintiffs' schools. On the other hand, such accommodation does not approach the level where "the government itself has advanced religion through its own activities and influence." *Amos,* 107 S.Ct. at 2869, 97 L.Ed.2d 273; *see also Yoder,* 406 U.S. at 234 n. 22, 92 S.Ct. at 1542 n. 22 ("Such an accommodation 'reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall'" (citation omitted)). In sum, the "effects" prong of the *Lemon* test is not offended by § 3204.

It is the third prong of the *Lemon* test which is most directly implicated by plaintiffs' contentions. Plaintiffs maintain that the type of regulation of educational standards contemplated by New York's compulsory education law, particularly the insistence of the defendant superintendents to be permitted to conduct pre-arranged home visits during the instruction of their children, poses a significant threat of fostering the "excessive entanglement" of government with religion. Such a contention seems inconsistent with certain dicta contained in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, and *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060, indicating that the state has the power "reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils," 268 U.S. at 534, 45 S.Ct. at 573, since "if the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function." 392 U.S. at 247, 88 S.Ct. at 1928. Plaintiffs rely, however, on the Court's more recent decision in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), for the proposition that "a comprehensive system of supervision [of teachers at private

sectarian schools] ... inevitably lead[s] to an unconstitutional administrative entanglement between church and state." *Id.* at 410, 105 S.Ct. at 3236–37.

In *Aguilar*, the Court invalidated the City of New York's practice of using federal funds to pay the salaries of public employees who taught courses in parochial schools. That case is distinguishable from the case at bar in two important respects. First, *Aguilar* involved state financial aid to sectarian institutions. As was noted in *Lemon*, "[t]he history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance." 403 U.S. at 621, 91 S.Ct. at 2115; *see also Walz v. Tax Comm'n*, 397 U.S. at 675, 90 S.Ct. at 1414–15. The *Aguilar* majority emphasized that in order for the City to assure that its program did not have the primary effect of advancing religion and thereby violating the second prong of the *Lemon* test, a comprehensive system of state supervision of the teachers involved would be necessary. The Court, quoting from *Lemon*, observed that " 'a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment;' " instead, " '[a] comprehensive, discriminating and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected.' " 473 U.S. at 410, 105 S.Ct. at 3236 (quoting 403 U.S. at 619, 91 S.Ct. at 2114). Such "prophylactic contacts" were deemed an excessive entanglement of church and state. *Id.* In the case at bar, neither direct nor indirect financial aid to non-secular institutions is involved. Consequently, ongoing inspection is not "required to ensure the absence of a religious message" in the lessons given by homeschoolers, as was the case in *Aguilar. See id.* at 412, 105 S.Ct. at 3238.

Second, *Aguilar* condemned the regular and pervasive nature of the state inspections involved in administering the program at issue there. In the present case, the defendant superintendents require in the broad range of cases only one or two pre-arranged visits to the home instruction sites during the school year. The more limited nature of such inspections places this case closer to *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed. 2d 1060 where the Court upheld a program through which the state supplied sectarian schools with textbooks, and *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, where the Court upheld state tax exemptions for real property held by religious organizations and used for religious worship. In *Allen*, the sort of inspections that were required to assure that the textbooks did not have the primary effect of promoting religion were not deemed unduly pervasive. Similarly, in *Walz*, the state had an on-going duty to ascertain whether exempt property was being used for religious worship, a duty that presumably could not be discharged without state officials making occasional on-site visits. *See* discussion in *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112. These cases involved a degree of state interference with religion that was found to be permissible under the establishment clause. The on-site inspections required by New York's local school officials is of a similar degree.

Plaintiffs argue that a more pervasive involvement on the part of the state could occur if a homeschooling program has difficulty in obtaining the approval of local school officials. The Supreme Court has stressed that "[e]ntanglement is a question of [both] kind and degree." *Lynch*, 465 U.S. at 684, 104 S.Ct. at 1365. A certain amount of contact between government and religious organizations is inevitable. *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112; *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). The nature of the state's involvement with the plaintiffs' schools implicates only the manner in which those schools "perform their secular educational function." *Board of Education v. Allen,* 392 U.S. at 247, 88 S.Ct. at 1928. No state interference with the religious training given students attending such schools is contemplated by the sort of state interaction with plaintiffs' schools that would be required if immedi-

ate approval of those schools was not obtained. The present case simply lacks the pervasive governmental presence that has been found offensive in the establishment clause cases plaintiffs rely on. Defendants are entitled to summary judgment on the establishment clause claims raised by the Blackwelders and Lonnevilles in their amended complaint.

G. *Due Process Challenge to "Biased" Decisionmaker*

Finally, plaintiffs argue that by entrusting approval of their homeschooling programs with local school officials, New York's compulsory education scheme violates their procedural due process right to an impartial decision-maker. Plaintiffs contend that because certain school districts in New York receive state funds on a per-pupil basis, local school officials, including the defendant superintendents, would have an incentive to disapprove of home instruction programs so that enrollment would be increased in their districts.

A challenge to the procedures utilized by state actors in reaching some decision implicating the interests of private parties requires a balancing of those private interests against the state's interest in the challenged procedure. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The Second Circuit, tracking the *Mathews* structure of analysis, has identified several factors relevant to a determination of whether a particular decisionmaking procedure challenged on the ground that the decision-maker lacked impartiality offends due process, among them being the "character of the decision being made, ... the nature of the individual and governmental interests at stake, ... and the feasibility of alternative procedures." *Wolkenstein v. Reville,* 694 F.2d 35, 41 (2d Cir.1982), *cert. denied,* 462 U.S. 1105, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983) (citations omitted).

The parties disagree about the character of the decision a superintendent makes when he determines whether a homeschooling program meets the minimum requirements of the compulsory education law. Plaintiffs argue that this determination is adjudicative in nature, equivalent to a "finding" by an administrator acting in a quasi-judicial capacity, and thus the procedures used for making that decision must be measured against the standards articulated in cases like *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and *Ward v. Village of Monroeville,* 409 U.S. 57 (1972). Defendants convincingly dispute this, noting that a superintendent's only authority is to determine whether a homeschooling program is "substantially equivalent" to the quality of education offered in the local public school district and, if not, to inform the Department of Social Services that a child is not enrolled in an approved program. A superintendent cannot require a child to attend the public schools nor punish parents for failing to assure that their children attend an approved school, nor can he on his own initiative commence child neglect proceedings. *See supra* note 10. Moreover, by determining whether a particular program satisfies the requirements of the Education Law, a superintendent does not resolve an issue that has divided two opposing parties, as individuals acting in a judicial or quasi-judicial capacity commonly do. *See* 2 K. Davis, *Administrative Law Treatise* § 7.3 at 12 (2d ed. 1979); *cf. Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 1107–08, 55 L.Ed.2d 331 (1978), and *id.* at 367–69 (Stewart, J., dissenting) (discussing judicial immunity from an action for damages pursuant to 42 U.S.C. § 1983). The Supreme Court has indicated that officials who do not perform adjudicative functions are not held to the "rigid requirements of *Tumey* and *Ward,*" *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980), though such officials are not completely free of due process limitations on partisanship. *Id.* at 249, 100 S.Ct. at 1616–17. In the case at bar, it is unnecessary to resolve whether school superintendents perform adjudicative functions in assessing homeschooling programs, however, for even assuming they do, plaintiffs have failed to demonstrate that their private interest in having their programs assessed by an im-

partial adjudicator is threatened by existing procedures.

■ Administrators who serve adjudicative functions are presumed to be unbiased. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1949). This presumption can be overcome by showing that the decisionmaker has a personal or institutional financial interest in the outcome of the decision made. *Wolkenstein,* 694 F.2d at 42 (citing *Tumey, Ward,* and *Gibson v. Berryhill,* 411 U.S. 564, 578–79, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973)).[39] As Judge Friendly noted in his comprehensive discussion in *Wolkenstein,* the ultimate inquiry is whether plaintiffs have shown that the decisionmaker has a financial interest in the dispute rising to the level of a " 'possible temptation to the average man as a judge.' " 694 F.2d at 42 (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444). In *Tumey,* the Supreme Court struck down the manner in which a fine had been assessed against a criminal defendant for the violation of Ohio's prohibition statute. Under the existing scheme, the mayor of a village presided over the trials of violators and doled out fines for any transgressions that were found. The proceeds of the fines went in part toward village improvements and repairs, and the mayor presiding over the trial received costs for hearing such cases, but only if the defendant was convicted. This scheme violated due process in two ways: first, "the mayor, 'as an individual,' had a 'direct, personal, pecuniary interest' in the costs which he received from convictions," and second, the mayor, "charged with the business of looking after [the village's] finances, had a strong 'official motive to convict and to graduate the fine to help the financial needs of the village.' " *Wolkenstein,* 694 F.2d at 39 (quot-

ing *Tumey,* 273 U.S. at 523, 531–35, 47 S.Ct. at 441, 444–45).

One year after *Tumey* was decided, the Supreme Court distinguished it and rejected another due process challenge to a conviction obtained in Ohio's so-called "Mayor's Courts." *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928). In *Dugan,* the mayor was a salaried official who did not receive any portion of the fines levied as costs for hearing the prohibition cases. Consequently, the mayor had no personal financial incentive to decide a case one way or the other. Moreover, the mayor of the city in which the conviction was obtained performed no executive functions, nor was he "responsible for the financial condition" of the city. *Id.* at 65, 48 S.Ct. at 440. Instead, the city manager was the "active executive" and a five-member city commission was responsible for raising the city's revenues. *Id.* at 62–65, 48 S.Ct. at 439–40. Though the mayor was one of the five members of the city commission, the Court found that his "relation ... to the fund contributed to by his fines as judge, or to the executive or financial policy of the city" was too "remote" to raise an inference of bias. *Id.* at 65, 48 S.Ct. at 440.

Between *Tumey* and *Dugan* falls *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), yet another case involving Ohio's "Mayor's Courts," this time in meting out fines for traffic offenses. Again, the first ground for the *Tumey* holding was not implicated, since the mayor in *Ward* did not have a personal pecuniary interest in the outcome of the cases over which he presided. Nonetheless, the challenged fine was found violative of due process. Unlike the situation that existed in *Dugan,* the mayor in *Ward* possessed "wide executive powers" and "exercised general overall supervision of village affairs." 409 U.S. at 58, 93 S.Ct. at 82. Moreover, the village derived a "major part" of its resources from the fines and

---

**39.** The presumption of impartiality can also be rebutted by a showing that the adjudicator's decision was improperly tainted by personal bias or an illegitimate predisposition to facts or law. *Anderson v. Dolce,* 653 F.Supp. 1556, 1568 (S.D.N.Y.1987) (citing, *inter alia, Taylor v.*

*Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), and *Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 13–14, 34 L.Ed.2d 50 (1972)). Plaintiffs do not allege or demonstrate facts giving rise to an inference to such bias in the present case.

fees imposed by the mayor in the cases he heard. *Id.* at 58–59, 93 S.Ct. at 82. Under those circumstances, the second ground of the *Tumey* holding served as precedent for invalidating the existing procedure for levying traffic fines in the Village of Monroeville, Ohio.

Applying the principles derived from *Tumey, Dugan,* and *Ward,* as illuminated by Judge Friendly's opinion in *Wolkenstein,* the court finds that the defendant superintendents' role in assessing plaintiffs' home instruction programs does not violate plaintiffs' procedural due process rights.[40] Initially, the court notes that the first ground for invalidating the procedure at issue in *Tumey* is inapplicable in the present case, since there is no allegation that the superintendents or other school officials involved with the evaluation of homeschooling programs have a personal financial stake in the decision made with regard to such programs. Further, plaintiffs have failed to demonstrate that there exists an "official motive," *Tumey,* 273 U.S. at 535, 47 S.Ct. at 445, or even a perceptible tendency, for New York's school superintendents to disapprove of home instruction programs in order to increase their school district's share of state funding.

Plaintiffs' position is defective in a number of regards. First, the record indicates that the cost of educating a child in each of the school districts whose superintendents are defendants in this action exceeds the amount of state aid these districts receive for each child enrolled in their schools. *See* Addendum to Proposed *Amici Curiae* Brief. Plaintiffs have presented nothing more than conclusory statements in support of their contention that these school districts would have a financial incentive to withhold approval for their homeschooling programs, and such statements are insufficient to withstand a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Second, even assuming

such a financial incentive does exist, a school superintendent in New York is not responsible for assuring that the money necessary to run his school system is provided. *See Wolkenstein,* 694 F.2d at 42. Under New York law, it is the school boards and not the superintendents who prepare and submit budgetary requests to local executive and legislative bodies. *Id.* (citing N.Y. Educ. Law § 2576 (McKinney 1981)). This fact places this case closer to *Dugan* than it does to *Tumey* and *Ward.* Third, there is nothing in the record indicating that the incremental increase in state aid that might result if children attending home instruction were enrolled in public schools instead would be so great as to be considered "substantial and vitally important" to the fiscal well-being of the state's school districts, a factor the Second Circuit has deemed significant. *See Wolkenstein,* 694 F.2d at 43. Finally, any decision made by a superintendent concerning the "substantial equivalence" of a homeschooling program is subject to review by New York's Commissioner of Education and, should educational neglect proceedings be instituted, by a Family Court judge. Though the Supreme Court has found in a criminal case that the availability of review *de novo* before an unbiased tribunal does not cure the due process violation occasioned by an initial determination by an adjudicator whose impartiality has been compromised, *Ward,* 409 U.S. at 61–62, 93 S.Ct. at 83–84, the Second Circuit has indicated in dictum that in the civil context, the availability of "prompt, full, and inexpensive judicial review" of a "decision of a school administrator" is relevant in assessing a due process challenge based on the alleged bias of an adjudicative decisionmaker. For the foregoing reasons, plaintiffs' procedural due process challenge is rejected.

## H. *Defendants' Motion for Sanctions and Attorney Fees*

 Defendants seek to recover the costs and attorney fees associated with de-

---

**40.** The court will assume that the same standard of scrutiny should be applied in this case as was applied in *Tumey, Dugan,* and *Ward,* even though those cases involved criminal sanctions while the case at bar is civil in nature. The

nature of the private interests involved in this case are of greater consequence than those at stake when an individual is threatened with a fine for a traffic offense or a misdemeanor violation of Ohio's old prohibition laws.

fending this action under 42 U.S.C. § 1988. Section 1988 gives the court the discretion to award costs and fees to a "prevailing party." In cases where the defendant prevails, however, an award under § 1988 can be made only upon a finding that the plaintiff's claim is " 'frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.' " *Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978)); *see also Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). The Second Circuit has stated that the "proper test" for assessing a defendant's motion for § 1988 fees is "whether the claim itself is meritless," and the court is to measure the merits of the plaintiff's claim against an objective standard. *Davidson v. Keenan*, 740 F.2d 129, 133 (2d Cir.1984). In the instant action, none of plaintiffs' claims sink to the level of frivolity contemplated by this standard, and thus defendants' motion is denied. Defendants' motion for sanctions under Fed.R.Civ.P. 11 is also denied.

### III. CONCLUSION

The motion by the New York School Boards Association, Inc. and the New York State United Teachers, AFL–CIO, for leave to file an *amici curiae* brief is granted, and the Clerk of the Court is directed to file the brief submitted by those organizations. The claims made by the Standish family are dismissed under the doctrine of abstention. Defendants' motions for summary judgment on the claims of the Blackwelders and the Lonnevilles are granted. The Clerk is directed to enter judgment accordingly.

It is so Ordered.